### MOORHEAD v. SEYMOUR et al.

(City Court of New York, Trial Term. May, 1901.)

1. SPECIAL PARTNER—CONTRIBUTION OF CAPITAL.
    There is not a contribution of capital by a special partner, so as to relieve him from liability as a general partner, where the firm obtains money from a third person, giving him its note therefor, then gives the special partner its check, and he gives it back his check for a like amount, and a large part of the money is then paid to the person from whom the firm obtained the money.

Action by Silas E. Moorhead against Henry A. Seymour and others to hold defendant David Webster liable as a general partner in the firm of Seymour, Johnson & Co. Tried before the court, a jury being waived. Judgment for plaintiff.

Albert P. Massey (Charles G. F. Wahle, Paul Armitage, and Edwin B. Root, of counsel), for plaintiff.

Charles N. Morgan & Son (Chas. N. Morgan and Geo. E. Morgan, of counsel), for defendant Webster.

HASCALL, J. The evidence adduced upon the trial shows the following facts: That prior to January 2, 1900, the defendants Seymour and Johnson were partners in business under the firm name of Seymour, Johnson & Co. Needing more capital, Mr. Johnson procured Dr. David Webster, a prominent physician of this borough, to take an interest in their business. Mr. Seymour never saw Dr. Webster more than once, and that was at the office of the firm. All transactions in reference to the copartnership were carried on, as he supposed, by Mr. Johnson. Seymour never had any conversation with Dr. Webster in reference to any of these matters, his becoming a special partner, or his relations to the firm. On the 3d day of January, 1900, an alleged copartnership between the three defendants was formed, and there was filed in the office of the clerk of the county of New York a certificate, as required by law, duly executed and acknowledged by Dr. Webster, declaring that he was the special partner and contributed $100,000. This certificate was accompanied by the affidavit of both general partners,—Mr. Johnson and Mr. Seymour,—in which affidavit, pursuant to the terms of the Partnership Law, § 34 (Laws 1897, c. 420), they, under oath, declared "that the sum of $100,000, specified in said certificate to have been contributed by said special partner, said David Webster, to the common stock of the said partnership, has been actually and in good faith paid in cash." That thereafter, on the 7th day of February, 1900, there was filed a second certificate of further capital being paid in by the said special partner, and pursuant to the terms of law it was also accompanied by the affidavit of both the general partners, and stated that the "additional sum of $100,000 specified in the above certificate to have been contributed by said special partner, David Webster, has actually and in good faith been paid in in cash to the common stock of said partnership; that said David Webster has thus contributed in all to the common stock of said partnership the sum of $200,000; and that this amount has been actually and in good faith paid in in cash to the common stock." Subsequently the certificates of the formation of the special partnership, with the necessary acknowledgments and affidavits, were printed and published agreeably to law in the New York Law Journal and the Weekly Union for the period of six weeks successively. Thus the formal requirements of the partnership law applicable to the situation of the parties (sections 34, 39) were complied with. The evidence further discloses that Dr. Webster, not having the large sum of money mentioned, was furnished the means for contribution by one of the general partners, in the following manner: Two certified checks, each for $100,000, were drawn to the order of Seymour, Johnson & Co., dated respectively January 2 and February 6, 1900, signed by the defendant Webster, and by him delivered to the firm. This $200,000 actually reached and was received by the firm, and for the time being became part of its ostensible, if not accessible, assets. The new firm of Seymour, Johnson & Company (that is, the special partnership attempted or assumed to be created by the three defendants on January 3, 1900) was, by the individuals composing it, deemed to be the successor of the copartnership, bearing the same name,

theretofore existing, as above stated, in which alone were the two
defendants Seymour and Johnson, the general partners in the new
special copartnership. The defendant Webster had had as a patient,
and thus became acquainted with, one of the general partners, Mr.
Johnson, who requested him to become a special partner in the
firm then about to be formed, and furnished Webster the means nec-
essary to enable him to become such special partner in the following
manner: On January 2, 1900, Johnson delivered to Webster a cer-
tified check of Wells, Fargo & Co., for $100,000, payable to the order
of Seymour, Johnson & Co., and by the firm, or some member
of it, indorsed to Webster. This check was deposited by Webster
in the Lincoln National Bank, to his individual credit. The check of
Wells, Fargo & Co. represented money borrowed from one Edward
F. Goslin by Johnson and Seymour just at or before the formation
of the new firm, and on the same day. There was at this time
on the books of the former firm of Seymour, Johnson & Co. an ac-
count entitled, "H. A. S. U. G. in Trust." This was an account of
H. A. Seymour in trust for Goslin, a customer and creditor. A check
for $60,000 was drawn by Seymour, Johnson & Co. to the order of
H. A. Seymour, by him indorsed to Wells, Fargo & Co., and de-
posited with them. The $60,000 represented by the check drawn to
Seymour's order was charged to this trust account of Seymour for
Goslin, and at that identical time there was in that account, to the
credit of Mr. Goslin, $75,000. Wells, Fargo & Co. then gave their
check of $100,000 to Seymour, Johnson & Co., and it was this check
which was given to Webster with which to make his contribution of
special capital to the new firm. On February 6th Johnson and Sey-
mour borrowed from Mr. Goslin the further sum of $100,000. There-
upon a check was drawn by Seymour, Johnson & Co. (Dr. Webster
then unquestionably being a partner) for this sum to the order of
Frederick W. Johnson, by him indorsed to the defendant Webster,
by him deposited in the Lincoln National Bank to his individual
credit, and, the same day, drawn upon by him by his check to the
order of Seymour, Johnson & Co., which was certified and paid in
to the capital of his firm. This second $100,000 was procured by
Goslin, or raised for him, by the sale of 40 United States bonds, the
avails amounting to $43,975. This sum, carried to the account of
"H. A. Seymour, special," in which was already a balance of $60,000,
made a total of $103,975. The check for $100,000, delivered to Dr.
Webster, as above recited, was charged to and against this Goslin-
Seymour trust account. It further appears that the firm, Seymour,
Johnson & Co. (Dr. Webster being a member), gave its certain de-
mand notes to Goslin as security for money so borrowed from him,
but the notes were not formally carried on the books of the firm as its
indebtedness. It also appears from the testimony of Mr. Seymour and
Dr. Webster that defendant Webster, during the existence of the
special copartnership, actually had no active part in the business,
never interfered in any manner with the management thereof; never
received or participated in any profits, or withdrew the money deposited
by him, or any portion thereof. Seymour and Johnson conducted

the negotiations with Mr. Goslin. Thus it was that certain moneys held by Seymour in trust for Goslin, and so appearing on the books of the firm, were handed to Webster (with the exception of $40,000 obtained from Wells, Fargo & Co.) to enable him to become a special partner, and pay into the capital of the firm $200,000, which was left there at the risk of the business. By a courteous conceding of facts by counsel, it is further stated that the firm, Seymour, Johnson & Co., was indebted to the plaintiff in the sum of $1,631.42 for balance due him as a result of various transactions in stocks prior to May 28, 1900; that on that date the firm made a voluntary assignment for benefit of creditors; that no part of plaintiff's claim has been paid, and that it amounts, with interest to the date of trial, to the sum of $1,704.83.

The defendant Webster, being the only one who defends this action, claims that, the requirements of the partnership law having been literally complied with, he became a special partner, with his liability limited to the sum of $200,000, the amount contributed by him. Inasmuch as the naked form of organization of a limited partnership was created, it is incumbent upon the plaintiff, in order to sustain his allegations, to show that the statute has been either disregarded or violated, before he can recover. In other words, he must prove that Dr. Webster never, in fact nor in law, contributed the sum of $200,-000 in good faith in cash to the capital of the firm; that the certificates and affidavits by the above members of the firm, filed in the county clerk's office on January 3 and February 7, 1900, were false and untrue; and that, as a consequence, Webster became and is liable, with his associates, as a general partner, under section 34 of the partnership law.

There is practically no dispute regarding the principal facts above stated,—the mode in which the money was raised, the manner of its transfer to the firm, the purpose of its passing through the hands of Dr. Webster to enable him to satisfy the requirements of the statute by having the written evidence of capital, credit, and faith, even though none existed in fact. Summarized, the evidence is that certain moneys held by Seymour in trust for Goslin, and so appearing on the books of the old firm, were, through various hands and by numerous checks, turned over to Webster (with the exception of $40,-000 obtained from Wells, Fargo & Co.) to enable him to become a special partner in the new firm; that he did, in form, by certified check, pay into the firm's capital $200,000, left the same there at the risk of the business, and for an instant it became an apparent book asset, whether temporary, substantial or otherwise, although directly thereafter a large part was transferred to the ultimate source whence it came. Upon these uncontroverted facts, the situation and condition of the parties, under application of the partnership law, will necessitate examination of the act and the authorities to determine whether the statute has been satisfied, whether the transactions amount to a contrivance or subterfuge to effect a semblance of payment, or whether, in fact and law, the contribution of Dr. Webster was actual, —"in good faith, in cash, paid in." As a means of enlightenment,

we may inquire whether the firm, as constituted and existing February 8, 1900, was enriched by Webster's contributions to the extent of $200,000; whether a transfer of credit from the Goslin account, in manner above detailed, was a contribution of "cash," within meaning of the statute, notwithstanding the intermediaries through whose hands the money or credits passed from Goslin's account back into it again; and, after all, whether it were material whether Goslin loaned the firm, or either of its members, money for the purpose of having himself paid from such loan? Did not, as a matter of fact, the defendant Webster receive his second $100,000 from the firm, of which he had been a member for over a month, pass through the idle ceremony of holding in his hand his own firm's check long enough to indorse his name upon the back, within an hour or two deposit and draw against it, and pay back to his firm, with his own check, the "cash capital" which the law requires to be, and which he swore was, "actually, in good faith, paid in?" It is claimed by Dr. Webster that the facts and circumstances shown upon the trial bring the transaction entirely within the letter of the statute; that it matters not whence he obtained his money to contribute, nor what was done with it directly after it had been paid into the capital of the firm; in other words, that, as regards the plaintiff and all other creditors, it is a matter of indifference, regarding his own personal liability, whence came the capital and whither it went, providing that for one fleeting moment his contribution was actually and in good faith paid in, and became an asset of his firm.

There are no equities existing in favor of the plaintiff, since the defendant Webster never received any of plaintiff's money, nor benefit therefrom, and has not in any way participated in profits of the business, if any there were. Plaintiff's relief, if any, must be almost entirely a technical one, and obtained by proof of failure on the part of the defendants to strictly comply with the statute, or, if the statute were followed in the letter, by showing that, in law and in fact, it was not in its essence, and that the special partner did not actually pay in, "in good faith and in cash," the contribution alleged. It may well be questioned, even if there were equities existing between the parties to the action, whether this court has the jurisdiction to decree their adjustment. It must be held that it has not.

It becomes necessary, of course, in view of these peculiar circumstances, to inquire as to the causes and necessity, object, and aim of the partnership law. Limited partnerships were unknown to the common law, but in some countries of Europe have existed for hundreds of years. 13 Am. C. L. 804. In Italy they were known and recognized in the laws of Pisa and Florence as early as 1166; in Geneva in 1562; in France (Marseilles) 1253; also under Louis X in 1315; and still continue under the republic, being regulated by the new code of commerce, "La Société en Commandite." In England it is said that limited partnerships only exist as joint stock companies. 1 H. Bl. 48. They seem to have been devised to enable persons to engage in mercantile business without being known or named, became the most frequent combination of trade, and in large

degree contributed to the commercial prosperity which the above-named countries afterward enjoyed. In our own state there was enacted a statute authorizing limited partnerships in the year 1822, being substantially a copy from the French act, and since that time similar laws have been adopted in most of the other states and territories which have patterned their statutes after that of New York. In these later days the object is to protect the special partner, enable him to employ his wealth in trade without risking more than he originally subscribed, and at the same time secure co-operation of men of integrity and ability. Has not the law been, through its variations and amendments, and is it not now, for the purpose of informing the general public, who may be thoroughly cognizant of the exact standing of the partnership and its individuals when they deal with them, as to their ultimate liability? But because of this immunity the law must be strictly and technically followed, in formation of the copartnership, in order to avoid a greater liability than the special partner lays upon himself when he joins the firm and makes a special contribution of capital. Statutory enactments in relation to the subject are construed by the light of the common law, and, being deemed remedial in their nature, a substantial compliance is generally all that is required, although some cases hold that compliance must be strict, and some both strict and substantial. Argall v. Smith, 3 Denio, 435. Mere defect, and where no one suffers from violation, if without knowledge, consent, or intent of the special partner, would be disregarded; and provisions which serve as a guide for conduct of the business will not alone render him liable as a general partner, unless he is chargeable with knowledge of an infraction and an intent to disobey. Van Ingen v. Whitman, 62 N. Y. 513. It must also be held that it is immaterial from what outside and innocent source the special partner derives the capital which he contributes. He may borrow, doubtless, from a partner in his individual capacity. The policy of the law seems to be satisfied by actual contribution of the money in such manner and effect that it becomes an asset of the firm for the discharge of liabilities to creditors. And the courts have held that, so long as the money actually reaches the firm, and is left there by the special partner, subject to the vicissitudes of the business, it is no concern of creditors whence or how the special partner obtains the money. In the case at bar, what happened was that an absolute liability, due partially by the old firm and partially by the new, to Goslin, was attempted to be made a floating liability (that is, liability of capital), with $40,000 additional borrowed, for the purpose of aiding one outside, but who immediately thereon became a party to that part of the transactions which made up the second contribution of $100,-000. It is asserted that the motive concerning the operations by which this large figurative capital was secured may be discovered without difficulty, and it must likewise be borne in mind, as Mr. Seymour shows, that the firm notes were given to Goslin for the amount of this special capital, although not carried upon the books as a liability of the firm, nor included in the schedules of its debts at the time of its failure and assignment for benefit of creditors. In

the whole transaction, claimed by defendants as one showing good faith, the different steps taken by the parties must successfully bear the closest scrutiny concerning that good faith, since the defense is technical compliance with requirements of the statute. In other words,—and this is the hinge of the case,—did Goslin's money, account, or credit, which, by his check, passed through Dr. Webster's hands and bank, and, after various other manipulations, was, or a large portion was, paid right back to Goslin, enrich the firm's assets so as to pay the contribution of capital contemplated and permitted by the statute, and become a substantial, active asset of the new firm available to innocent creditors?

Dr. Webster says upon this point:

"I never had any conversation with Mr. Seymour in reference to the affairs or transactions of the firm of Seymour, Johnson & Co. I never knew E. F. Goslin; never heard of him in connection with this case until just now; never had any communication with him in any way. I was not interested in the profits of that firm. I did not have anything to do with the management or control of its business. I was not at the office of the firm more than two or three times at the most. He [Mr. Johnson] brought the paper to me, and I signed it without reading it. He told me it was a paper making me a special partner, and that I had no responsibility connected with it whatever. I never gave him a paper showing that I was indebted to him in the sum of $200,000, nor to anybody else. So far as I was concerned, this matter was an accommodation—entirely an accommodation—to Mr. Johnson. I wanted to be friends with him. I did not suppose I was indorsing him for any amount of millions that he might spend. I had no idea of that amount. Johnson told me I could help him, and I believed it and acted thereon. I did not suppose that the money in the bank deposited to my account was mine to keep. It was mine while I did have it, to turn over to Seymour, Johnson & Co.; and for that purpose it was given to me, and for that purpose taken by me. Johnson went with me to the bank on the occasion of both contributions. I saw my name on the door of the office as the special partner. I do not remember whether or not there was any amount stated on the door there opposite my name."

It has been held that the requirement of the statute concerning the payment in cash is satisfied by the giving of a certified check. White v. Eiseman, 28 Abb. N. C. 363; Bank v. Palmer (Sup.) 9 N. Y. Supp. 239. And it seems a matter immaterial whence comes the money used by the special partner, for the statute is satisfied when the special capital is actually paid in, becomes an asset of the firm, and is left there by the special partner. Lawrence v. Merrifield, 42 N. Y. Super. Ct. 36, 73 N. Y. 590. "No part of the statute regulates the means which may be used by the special partner to obtain the money which he makes special capital. If there be fraud or unlawful means used, the remedy is not given by this statute; nor, while the other demands of the statute are answered, do these means injure the creditors or other partners. The nature of the transactions * * * becomes immaterial. * * *" See, also, Bank v. Stirrett, 15 Abb. N. C. 318, 97 N. Y. 320. In that case the court says:

"Literally, the defendant paid in $40,000 in cash, but it is urged that the spirit of the statute was evaded. I conceive that cash is paid in in good faith under the statute when it is paid in to stay there; the firm to have

the benefit of it; when it is not to be returned in any way to the contributor; in short, in the honest sense of the word, when it is paid it is paid in good faith."

These cases do not go so far as the inquiry compels us, in judicial honesty, in the case at bar, to proceed, to wit, to examine and ascertain whether or not, in the language of the last opinion, "It is not to be returned, in any way, to the contributor." The case of Ropes v. Colgate, 17 Abb. N. C. 136, is cited on the part of defendant, but is hardly applicable to the case at bar. In that case the court says:

"No preconcerted agreement in reference to these details [how the special capital was to be used] existed, and there is no evidence that would justify the inference that Mr. Colgate did not pay in his capital in entire good faith."

But in this case there is evidence, it seems to me, on which the court is justified (compelled, even) to find that Dr. Webster was lacking in the "good faith" required by law,—the good faith due to the commercial community. And right here in this connection it seems that the instant withdrawal of $75,000 from the capital of the firm, and payment back to the source whence it came, was an impairment, which, under section 39, Partnership Law, necessarily renders the defendant Dr. Webster liable. Did the whole transaction from the 2d of January to the 8th of February amount to good faith, as well as strict compliance with statutory requirement? Or, viewed in the light of incidental circumstances, was it more than a cover or contrivance to avoid the semblance of payment of capital, which in fact did not exist, so far as creditors and the public are concerned? So far as the evidence is concerned, the plaintiff is not bound by defendants' entries in their ledger as to Seymour's private or trust account. The articles of copartnership, if any exist, are not in evidence, and it is therefore but inference, when stating that there was no provision that the capital of the new firm should be used to pay off the indebtedness of the old, or that the new firm was to take over the assets, if any, of the old; but, in the absence of proof, must it not be so assumed? Of course the certificate of payment by the special partner would not cover this point, and it may be asserted that no such provision existed in the agreement by which the partners engaged in business together. This being so it is clear that the defendant Webster, at the time, at least, of the obtaining and payment to the assets of the firm of the second $100,000, was himself a member, borrowing from the firm's creditor, making himself liable as a partner for a debt not created in his individual capacity. "The object is to provide a fund subject to no contingencies or losses except those which come from the proper business of the partnership." Haggerty v. Foster, 103 Mass. 19. Was it the proper business of the new partnership to pay the indebtedness of the old to the person from whom Dr. Webster obtained the check for his "contribution"? It would appear that the transaction amounted to the borrowing by Seymour, Johnson & Co. of $100,000 from Goslin, and not a bona fide borrowing by Dr. Webster for the purpose of making aggravation of capital in the new firm. And with regard to the second transaction

and the second $100,000 there can be no doubt but that Dr. Webster, the special partner, might have borrowed from Seymour individually or Johnson individually and then have contributed, but that was not the case. He was at that time a member of the firm which borrowed the $100,000 from Mr. Goslin, and gave him demand notes signed and indorsed by the firm. Even if the contributions, amounting to $200,-000, were technical payments of capital in cash, yet directly thereafter $75,000 was withdrawn from this capital and paid back to the source whence it all came. This made an impairment and withdrawal of capital by him which, it seems, renders Dr. Webster liable under section 39. Did he not, as matter of fact, borrow from the firm of which he was a member? It is pertinently asked, in what respect was the firm's capital increased, or the fund required by statute enhanced for the protection of creditors? True it is that Dr. Webster did not receive back any of the money, but the person from whom Johnson borrowed the contribution did, and it can be claimed that the partnership, Seymour, Johnson & Co., loaned or made gift to its own special partner of its own funds, so that, if the transaction amounted to a mere exchange of checks between the firm to Webster and by Webster back to the firm, it surely was not contribution to the capital. The appellate division (Casola v. Kugelman, 33 App. Div. 433, 154 N. Y. Supp. 89) says concerning the act:

"The object is to protect the special partner. The law does not impose a liability which would not exist, but the shield the statute affords is withdrawn whenever acts interdicted by the statute are done."

The firm was organized pursuant to the Laws of 1897, c. 420, which, among other things, provides:

"If any false statements be made in any such certificate or affidavit, made either upon the formation or increase of capital, * * * the persons interested therein shall be liable as general partners."

Is the mere formal compliance with the statute sufficient? In the language of the highest authority of our state, "the essential facts upon which the certificate and affidavit purport to be founded must exist, and be truly stated in them, to give efficiency to the statutory partnership." Bank v. Colgate, 120 N. Y. 390, 24 N. E. 799, 8 L. R. A. 712. The statute must be strictly construed. Nothing will satisfy the law concerning contribution but "cash." The certified check was "cash," however. All the circumstances and all the lights upon the case permit the allegation that the contribution in this case was not made in actual cash, notwithstanding the passing of Exhibits A and B, but by transfers of a customer's credit, and, following upon its heels, a satisfaction, or partial satisfaction, of a debt against the prior firm due to that same customer! This was not a payment "in cash." Van Ingen v. Whitman, 62 N. Y. 513; Kohler v. Lindenmeyr, 129 N. Y. 498, 129 N. E. 957; Bown v. Butler, 58 Hun, 515, 12 N. Y. Supp. 810. Special partners have been held liable as general partners in some oft-quoted and also some less-known decisions in our state. "Though the form was gone through with, the money was not paid in with any intent that it should be devoted to any of the business of the new

firm, or be subject to its obligations or risks." Loomis v. Hoyt, 52 N. Y. Super. Ct. 287. "In no legitimate sense of the word can the paying of money one hour, and receiving it back the next, be said to be a contribution. To satisfy the statute the special partner must pay his money into the common stock, and leave it there at the risk of the business. On payment the devotion must be actual and absolute, not apparent and illusionary." To be sure, Dr. Webster left what he had, but had he contributed anything? A fictitious figure was written among assets, but a large portion was at once appropriated to indebtedness of a former firm, of which he was not a member. The mere exchange of checks between his firm and himself did not amount to a contribution, actual and absolute. See Lineweaver v. Slagle (Md.) 2 Atl. 826, 54 Am. Rep. 776. It has also been held:

"Promissory notes of the supposed special partner payable on time to the general partner, and which, when negotiated, constituted a debt for which both members of the firm were liable, was, in no legitimate sense a contribution of money to the common stock, and was a clear violation of statute. It created no fund or capital to which persons dealing with the firm might look for payment of their debts to substitute in its place a debt for which each copartner was severally liable." Pierce v. Bryant. 87 Mass. 91.

In the case at bar the house of Seymour, Johnson & Co. raised the money on credit of its signature to the notes, handed it to Webster, and he handed it back to the firm. Conceding that the transactions between the parties amounted to a transfer of credit balances, even then, under the cases above cited, this would not be a contribution "in cash," and it cannot be contended that delivery of the checks to defendant Webster operated as a payment of money standing to the credit of Goslin, since, directly, he was paid $75,000 on account of the notes given by Seymour, Johnson & Co. when the second loan of $100,000 was raised and made; at least, it must be held the transactions amounted to that. And Dr. Webster, apparently honest and acting from the best of motives, nevertheless, became an instrument of wrong toward the public. "The statute is thwarted, the public misled and its reliance misplaced and deceived, as much when there is an unintentional charge as when there is an intentional one." Van Ingen v. Whitman, 62 N. Y. 520. If it still be argued that Dr. Webster's contribution was in cash, then it must be held that the money was not his. It was not raised or borrowed by him, but came from the hands of Seymour, Johnson & Co., from one of its clients. Webster neither investigated nor cared to inquire whence or how his friend Johnson obtained, or if he actually obtained at all, the means for the creation of the two checks for $100,000 each. It is doubtless a hardship that he should find himself charged and chargeable as a general partner when he supposed he never could become liable for any sum whatever; but he duly certified and held out to the business community that he had contributed to the common stock these several sums making $200,000, when, as matter of fact, he had not contributed and did not intend to contribute a single dollar! The creditors of his firm, save only Goslin, had never a dollar more as assets to charge or impress with liability.

It must be observed that the cases cited against the plaintiff are good authorities, so far as they go, upon the point as to what constitutes a sufficient payment "in cash." In some instances it is property; in others, credit, there being no indebtedness at the time; in others, certified checks; and in others, the avails of promissory notes. But none of them seem to go to the extent required to meet the contentions of the defendant in the case at bar as to the good faith, potentiality, and substance of the contribution. If it be contended that the Goslin account standing on the books of the new firm was canceled absolutely, as a liability of the old firm, it may well be questioned whether such liability, if it existed, were not purely a fiction of bookkeeping, since it is not in evidence, as above stated, that the new firm assumed any liabilities of the old, and plaintiff may not be concluded by defendant's books. The predicament of Dr. Webster is, in the simplest language, this: There was no loan to him from which he made his contribution. There was no liability on his part to anybody for it. He parted with nothing to get it; firm notes were given to cover the transaction. He left nothing at the risk of the business, which became neither richer nor poorer from his membership. So far as he was concerned, Mr. Johnson delivered to him, downtown, $100,000 drawn from Seymour, Johnson & Co., and the doctor handed it back to him in a different part of the city. The recognized conditions, which would otherwise make the special partner liable, as general, do not exist in this case, and are not urged, such as interference with or participation in the general management of the business, the withdrawal of special capital, or some part thereof, and so on.

There appear some very noticeable and peculiar incidents, which, in determining the main issue, it is proper to consider, although they may not materially aid in making out necessary preponderance of evidence. These appear in the testimony of Mr. Seymour, who declared that the notes of his firm were given to secure all of this loan of $200,000; that the notes were not entered on the books, but were carried, nevertheless, as an indebtedness of the firm; that (and shows by extract from the ledger) Seymour, Johnson & Co. paid to Goslin $75,000, part of the money gotten from him and alleged to have been contributed by Webster, and making use of special capital to pay off indebtedness incurred in borrowing the money which constituted the special capital! It was shown, also, by testimony of an expert accountant, that a trial balance, taken from the books, showed an increase of deposits at the time of the formation of the partnership, or shortly after Dr. Webster's second contribution of $200,000, but also that there is an absence of a debit of $200,000 for the notes, which somebody held, for money borrowed by the firm for which the notes were given, which money, or the checks therefor, represents the sum passed through Dr. Webster's bank and back to his firm! The cases cited on behalf of the defendant deal with property active and unhampered, whereas the case before us seems, in the light thrown upon it, to be a dealing in indebtedness due from a copartnership to which defendant Webster improperly certified he would contribute fresh

capital. Goslin in fact contributed the capital, and at once received back from Webster's firm a great part of it. The firm was not enriched; creditors were not helped by it, although one creditor was. He has never proceeded against his alleged debtor, Webster, to collect from him, and Dr. Webster has never repaid the amount of the loan, nor any part thereof.

From the foregoing it follows, in the terms of the learned higher court, that:

"The immunity of a special or limited partner from general liability is founded upon the statute which clearly contemplates a payment in good faith by the special partner of the contribution to the capital stock of the firm specified in the certificate. Hence, if not paid, and the statement in the certificate signed by all the partners and in the affidavit attached was false, the statute was no protection to one claiming the rights or immunities of a special partner." Hotopp v. Huber, 160 N. Y. 524, 55 N. E. 206.

Where those attempting to become special partners pay in their special capital by check, and make affidavit that the payment is by cash, and receive from the firm its check for a like amount, these checks being given to pay money due the partners from a former partnership, their liability is that of general partners. Loomis v. Hoyt, 52 N. Y. Super. Ct. 287. Is not the situation in the case at bar, with respect to the contention of the plaintiff, even stronger than this one last cited? In Lineweaver v. Slagle, 64 Md. 465, 2 Atl. 693, 54 Am. Rep. 775, where on the formation the special partner gave his certified check for $10,000, which was deposited to the credit of the new firm, and then the firm gave him its check for a part thereof, appearing to his credit on the books of a former firm composed of the same members, it was held that this was not an actual "cash contribution," and liability as a general partner was decreed. This seems similar to the case at bar concerning the attitude and condition of Dr. Webster and Mr. Goslin. The payment to the general partners must be unrestricted, unqualified, in good faith, and left absolutely subject to the risks of the business; and, however the special partner may have acquired the money he contributes, if it is obtained by a contrivance to evade the statute, and if he depletes the firm's assets by his method of procuring it, the means used by him are at once of greatest consequence. See Benedict v. Van Allen, 17 U. C. Q. B. 234.

It is therefore decided that the requirements of the partnership law applicable to this case have been sought to be evaded, and there must be judgment for the plaintiff accordingly. Findings and conclusions may be presented in conformity with this decision, and, thereafter, order for judgment may follow, to be settled upon two days' notice, when all motions incident to trial will be heard and determined.