## BANCO MEXICANO DE COMMERCIO E INDUSTRIA ET AL. *v.* DEUTSCHE BANK; MILLER, ALIEN PROPERTY CUSTODIAN, ET AL.

### APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 361. Argued January 9, 1924.—Decided January 21, 1924.

1. A suit in equity brought under § 9 of the Trading with the Enemy Act, against the Alien Property Custodian, the Treasurer of the United States and a foreign corporation, to establish a debt of the corporation to the plaintiff, as a claim against its property seized under the act and held by the Custodian and the Treasurer, is in effect a suit against the United States, and can therefore be maintained only under the conditions laid down in the act. P. 603.
2. Where money was lent by liquidators of a Mexican bank, at New York, to a German bank, and deposited by the borrower to its general credit with a trust company in that city, and, after the outbreak of the late war, before the loan fell due, the deposit with other assets of the borrower was taken over by the Alien Property Custodian, *held,* that suit to collect the loan could not be maintained by the Mexican bank under the above statute, since the debt was not one that " arose with reference to the money or other property held." P. 599.
3. The fact that, under the law of New York, the debt, when due, might have been collected by attachment of the property, had this not been seized under the statute, did not alter the case. P. 602.
4. Legislative history of this statute, including remarks of a congressman explaining the bill, *held* not to determine its construction. P. 601.

289 Fed. 924, affirmed.

APPEAL from a decree of the Court of Appeals of the District of Columbia affirming a decree of the Supreme Court of the District, which, on motion, dismissed the bill in a suit to enforce a claim under the Trading with the Enemy Act.

*Mr. Henry W. Taft* for appellants.

In no sense, either etymologically or grammatically, does the description that a debt "arose with reference to the money or other property," convey the idea of a definite legal relation, recognized in our system of law, of the debt to the "money or other property." The words are merely those of general description. If it had been intended to connote accepted legal concepts, appropriate language could easily have been selected. In a colloquial, business, etymological and grammatical sense, there are many cases where it may with accuracy be said that a debt has been incurred with reference to certain money or property, as, for instance, where by the ordinary processes of the courts the indebtedness could be collected out of such money or property belonging to the debtor. With equal accuracy the same language might be applied to a case where the creditor expected that a debt would, in the ordinary and current course of business, be paid out of money or property which was being employed in the business in connection with which the debt was incurred, and where the creditor relied on the continuing availability of such money or property as the basis of the credit. In other words, it is reasonable to look upon "with reference to" as equivalent to "with an eye toward."

The existing if incohoate right of the Banco Mexicano to sue upon the debt of the Deutsche Bank in the courts of the State of New York, where the loan was made and was payable, was a potential or executory remedy which needed only the presence in that jurisdiction of property belonging to the Deutsche Bank, to convert it into an effective legal security; and such security was actually available. It is not a violent assumption that it was the very existence of the money and property in this country, and, therefore, the likelihood of the payment of the debt, that were the inducements for the loan and

created the credit of the Deutsche Bank on which the Banco Mexicano relied. In a very practical sense, under the foregoing circumstances, therefore, the debt was incurred with reference to the money or property of the Deutsche Bank 'which came into the hands of the Custodian.

The Government is practically forced into the position of claiming that debts do not arise " with reference to the money or other property " except (i) where proceeds of a sale can be traced into the property, or (ii) where a contract for the purchase or sale of specific property has been made and there can be some remedy for compelling its delivery, as in a suit for specific performance, or (iii) where there is some kind of specific lien, legal or equitable, upon the property, or (iv) where title is based on physical identity and there may be recovery of possession as, for instance, by writ of replevin. But it is obvious that if the debt referred to in sub-section (e) of § 9 is confined to such cases, an intention must be attributed to Congress to destroy existing remedies under laws of the several States, where the property could, before the act, have been reached in their courts in satisfaction of the debt upon judgment and execution. Such a purpose would be inconsistent with the liberal policy inaugurated by the general provisions of the original act as amended in 1919. 41 Stat. 35.

In the absence of some purpose clearly appearing from the language of the act itself or from its legislative history, there is a strong presumption that Congress did not intend by using such ambiguous language, not only completely to reverse the liberal policy of the earlier act, but also to deprive creditors of the remedies which they would otherwise have had for the collection of their debts in both the state and the federal courts. See *Kohn* v. *Kohn, Inc.,* 264 Fed. 253, 255; *Fischer* v. *Palmer,* 259 Fed. 355. By sub-section (f) of § 9 of the act, property in the hands of

the Custodian was to continue to be free from "lien, attachment, garnishment, trustee process, or execution," and was not to be subject to "any order or decree of any court." 41 Stat. 980.  Unless sub-section (e) is interpreted in accordance with our contention, the prohibition of subsection (f) results in what is in the nature of confiscation, and that is to be avoided.  If, however, the elastic language of sub-section (e) is interpreted so as to extend to the allowance of claims which could, except for the passage of the act, have been prosecuted to judgment in the courts of one of the States and have been satisfied out of the property found in such State, we avoid a violent disturbance of property rights and existing remedies, and there would be excluded from the benefit of the act only those persons having no business or residence connection with this country and possessing no specific claim to or lien upon the money or property in the hands of the Custodian.

The intention of Congress was to embrace by the provisions of subsection (e) cases other than those where there was a definite legal "interest, right, or title" in the seized property.  Both the counsel for the Government and the Court of Appeals have felt the pressure of this canon of interpretation, but in attempting to meet its requirements they find themselves logically forced to maintain that a debt which "arose with reference to the money or other property" must have been a debt which was related to such money or property in such a way that it could be satisfied by pursuing a right in the nature of a right *in rem* to, or a lien upon, the seized property.

In any conceivable case where a remedy exists either in law or in equity, to proceed against and secure possession of the money or property itself, it has been provided for in the first part of sub-section (a), which permits a person "claiming any interest, right, or title in" the seized property to maintain a suit in equity for its re-

covery. How can it be reasonably said that by sub-section (e) Congress intended to limit cases where debts could be collected out of the seized property to those where under sub-section (a) such property could have been resorted to?

Sub-section (e) vested in a court of equity the power to determine in each case whether a debt " arose with reference to the money or other property held by the Alien Property Custodian."

The statute should be interpreted so as to avoid the destruction of neutral rights and remedies, and a contravention of international law.

Our view of the proper interpretation of sub-section (e) is confirmed by the legislative history of the bill which became the amending Act of June 5, 1920. This history is a proper subject for the consideration of this Court.

The rule requiring the strict construction of statutes authorizing suits against the United States ought not to have been applied by the court below. The real party defendant is the Deutsche Bank. *United States* v. *Beebe*, 127 U. S. 338, 347.

*Mr. Assistant to the Attorney General Seymour*, with whom *Mr. Solicitor General Beck* was on the brief, for appellees.

MR. JUSTICE McKENNA delivered the opinion of the Court.

Appeal from the decree of the Court of Appeals affirming the decree of the Supreme Court of the District of Columbia which dismissed the suit of appellants, brought in the latter court by them under the Act of Congress of October 6, 1917, entitled, " An Act To define, regulate, and punish trading with the enemy, and for other purposes," as amended June 5, 1920. 40 Stat. 411; 41 Stat. 977.

The Deutsche Bank of Berlin was duly appointed liquidator of the Banco Mexicano, a banking corporation

organized under the laws of Mexico, and authorized to act in the process of liquidation through Elias S. A. De Lima and Carlos Schulze as the representatives of the Banco Mexicano. Upon their appointment they proceeded with the liquidation of the affairs of the bank.

By virtue of their appointment and during the period they were acting as such liquidators, they were authorized to make loans of the assets of the bank for its account and to collect and, if necessary, to sue for and collect upon the claim which is the subject of this action.

They as liquidators for and on behalf of the Banco Mexicano made a loan of 500,000 gold dollars in New York City on December 15, 1916, to the Deutsche Bank of Berlin, a banking corporation existing under the laws of the German Empire, for six months with interest at the rate of 5% per annum.

The amount was paid to Hugo Schmidt, the agent of the latter bank at its place of business in the United States, and the bank agreed to repay the same in that city on June 15, 1917, with interest at the rate above mentioned.

Upon receiving that amount, represented by check, the bank forthwith deposited the same with the Guaranty Trust Company of New York to the credit of its general bank account which it then had with that institution.

On April 6, 1917, war was declared between the United States and Germany. Thereafter, as the appellants are informed and believe, under the provisions of the Trading with the Enemy Act and other statutes in such case made and provided, all moneys, securities and property owned by the Deutsche Bank in the United States or held for it by others were turned over to or seized by the Alien Property Custodian of the United States and have ever since been held by him.

It is averred, on information and belief, that the money so loaned was never transferred from the United States physically or otherwise, but constituted a part of the bal-

ance of the general deposits and securities and other property in the United States of the bank which were taken over and seized by the Alien Property Custodian. The total amount of such balance and the total value of the securities and property, are unknown to appellants but are sufficient, as they are informed and believe, after the payment and satisfaction of all other claims and demands, fully to pay, satisfy and discharge the claim and demand of the appellants arising upon the loan.

After the loan was made and until its balance, securities and other property were turned over to the Alien Property Custodian, the Deutsche Bank continuously kept in the United States sufficient funds and property over and above what was necessary to pay and discharge all other claims and demands of every kind, to repay the loan with interest, and the funds and securities were kept in the United States for the express purpose and with the intention by the use thereof of repaying the loan when it fell due. And the bank would have, in the ordinary and usual course of business, repaid the same when the debt fell due, if war had not intervened between the United States and Germany.

On June 15, 1917, there became due to appellants from the Deutsche Bank, the amount of the loan; and it is still due, although they have made demands for the payment thereof upon the bank and the Alien Property Custodian.

In pursuance of § 9 of the Trading with the Enemy Act, the appellants as liquidators and in behalf of the Banco Mexicano, on or about May 27, 1920, filed with the Alien Property Custodian a notice of claim, under oath, and in such form and containing such particulars as was required by that section and as the Custodian had prescribed, demanding payment of the debt above described, with interest thereon then accrued, by the Custodian, from the money or other property belonging to the bank, or held by him or by the Treasurer of the United States.

On or about the same day a similar application was filed with the President of the United States. Neither the President nor the Alien Property Custodian has paid the debt or the interest thereon.

Appellants aver that since December 15, 1916, the Deutsche Bank kept in the United States sufficient cash and marketable securities over and above its obligations to enable it to pay the loan and interest, and that the Alien Property Custodian and Treasurer of the United States now hold sufficient cash and securities formerly owned by the bank and seized by the Custodian over and above all claims against the same to pay the debt with interest.

Appellants are advised and believe that under the law of New York State, and in the event of default by the Deutsche Bank in the payment of the loan, they would have had, on June 15, 1917, and ever since, and now have, a cause of action against the bank upon which they could have sued and can now sue, and could have procured, and can now procure, the issue of a writ of attachment under which the funds and securities of the bank in New York City could have been, and now can be, levied upon and seized and applied in satisfaction of a judgment obtained.

It is averred that by reason of the foregoing facts the debt of the appellants arose with reference to the money and other property within the meaning and intention of subdivision (e) of § 9 of the " Trading with the Enemy Act ".

A motion to dismiss the bill of appellants was made, the grounds thereof being: (1) appellants are claimants other than citizens of the United States, and that the debt which they are seeking to recover did not arise with reference to money or any other property held by the Alien Property Custodian or the Treasurer of the United States under and pursuant to the terms and provisions of the Trading with the Enemy Act, as amended.

(2) The appellants have not set forth facts sufficient to entitle them to equitable relief under § 9 of the Trading with the Enemy Act, as amended.

The motion was granted and a decree made and entered dismissing the bill.

Upon the appeal of appellants the decree was affirmed by the Court of Appeals of the District of Columbia, to review which action this appeal is prosecuted.

The case is in narrow compass. The facts are set forth in the bill; the law adduced, that is, § 9 as amended, it is contended, constitutes them grounds of recovery prayed for and demonstrates the error in the decree appealed from. We quote it although its pertinent and determining words are few. As passed October 6, 1917, it is as follows:

" That any person, not an enemy, or ally of enemy, claiming any interest, right, or title in any money or other property which may have been conveyed, transferred, assigned, delivered, or paid to the alien property custodian hereunder, and held by him or by the Treasurer of the United States, or to whom any debt may be owing from an enemy, or ally of enemy, whose property or any part thereof shall have been conveyed, transferred, assigned, delivered, or paid to the alien property custodian hereunder, and held by him or by the Treasurer of the United States, may file with the said custodian a notice of his claim under oath and in such form and containing such particulars as the said custodian shall require; and the President, if application is made therefor by the claimant, may, with the assent of the owner of said property and of all persons claiming any right, title, or interest therein, order the payment, conveyance, transfer, assignment or delivery to said claimant of the money or other property so held by the alien property custodian or by the Treasurer of the United States or of the interest therein to which the President shall determine said claimant is entitled: *Provided.*

That no such order by the President shall bar. any person from the prosecution of any suit at law or in equity against the claimant to establish any right, title or interest which he may have in such money or other property. If the Presi-, dent shall not so order within sixty days after the filing of such application, or if the claimant shall have filed the notice as above required and shall have made no application to the President, said claimant may, at any time before the expiration of six months after the end of the war, institute a suit in equity in the district court of the United States for the district in which such claimant resides, . . . to establish the interest, right, title, or debt so claimed."

The amendment of June 5, 1920, is as follows: "No money or other property shall be returned nor any debt allowed under this section to any person who is a citizen or subject of any nation which was associated with the United States in the prosecution of the war, unless such nation in like case extends reciprocal rights to citizens of the United States; nor in any event shall a debt be allowed under this section unless it was owing to and owned by the claimant prior to October 6, 1917, and as to claimants other than citizens of the United States unless it arose with reference to the money or other property held by the Alien Property Custodian or Treasurer of the United States hereunder." [§ 9(e)].

The amendment provides that: "Nor in any event shall a debt be allowed under this section unless it was owing to and owned by the claimant prior to October 6, 1917, and *as to claimants other than citizens of the United States unless it arose with reference to the money or other property held by the Alien Property Custodian or Treasurer of the United States hereunder.*"

The italics are ours and mark the words which make the controversy. The Court of Appeals regarded them a limitation upon the generality of the section as originally en-

acted—an exception from its indulgence of claimants other than citizens of the United States unless the debt arose with reference to the money or other property held by the Alien Property Custodian or Treasurer of the United States under the act.

We concur. The condition did not exist in the claimant. The debt did not arise with reference to the money or property held.. The transaction was an ordinary business one—money borrowed to be repaid at a specified distant date, a deposit of it in the ordinary way and with the legal result and relation—the creation of debtor and creditor—not a word or act else—not a word or act else giving the transaction other character or quality. No distinction, indeed, from any other transaction, nothing to give specification to it or particular remedy.

But particularity is not necessary, is the contention. Mere trace of a relation seems, in counsel's view, to satisfy the requirement of § 9. The definition of the Standard dictionary is adduced, and from it, it is said, it is reasonable to look upon " with reference to " as equivalent to " with an eye toward." To give this pertinence, necessarily, the eye must see what the statute requires to be seen—a debt that had fixed some right or title or equity to the money or other property held by the Alien Property Custodian or by the Treasurer of the United States.

In support of counsel's view, the explanation of the amendment by the congressman in charge of it is quoted as giving a remedy to a just " debt owed to a citizen of a friendly nation, that originated with reference to the property which is over here." And further " there would seem to be no reason in justice or good morals why that property here should not pay it subject to the limitation that it must have been a debt that accrued prior to the enactment of the Trading with the Enemy Act." This is given emphasis of meaning by the contrast of claims of " enemy

creditors " which it was declared " should be collected by other means than out of this property here." The views of the Attorney General were also referred to and the absence of any recommendation by the Committee on Interstate and Foreign Commerce of an intention "to make radical changes in the rights and remedies of friendly aliens as they had been created by the act previously in force."

It may be conceded that there is some suggestive strength in this history, but it is to be remembered that an act of legislation is not the act of one legislator, and its meaning and purpose must be expressed in words. If there be ambiguity in them it is the office of construction to resolve it. This we think the Court of Appeals exercised, and to a right conclusion.

A contention, or rather the support of the main contention, is made by appellants by reference to the New York statutory law which authorized, it is said, an action against a foreign corporation—in this case by the Banco Mexicano against the Deutsche Bank—for the collection of its note, a writ of attachment and a judgment that could be satisfied out of the property attached. And the further contention is that by § 9, as amended, " non-resident alien individuals and corporations were accorded broader rights even than they then enjoyed under the laws of New York, in that they could collect their indebtedness out of the property of non-resident alien enemies in the hands of the Custodian, wherever and however it arose, and whatever its nature." But this is a conclusion deduced from the construction put upon § 9 which we think is untenable.

We repeat, we do not think that the debt arose with reference to the money or other property held by the Alien Property Custodian.

Therefore, the prayer of the bill of complaint should be denied. We are constrained to this because we agree with

the Court of Appeals that this suit is in effect a suit against the United States and all of its conditions must obtain.

*Decree affirmed.*

The CHIEF JUSTICE took no part in the consideration or decision of the case.