ALLEY v. CLARK, Attorney General.

Civil Action No. 7502.

District Court, E. D. New York.

May 1, 1947.

J. Vincent Keogh, U. S. Atty., of New York City (Frank J. Parker, Asst. U. S. Atty., of Brooklyn, N. Y., and Victor R. Taylor, Atty., Claims Division, Department of Justice, of Washington, D. C., of counsel), for defendant, for the motion.

Sidney Friedman, of New York City (Henry J. Vogel, of New York City, of counsel), for plaintiff, opposed.

KENNEDY, District Judge.

This is a suit, said to be authorized by the provisions of Section 9(a) of the Trading with the Enemy Act of October 6, 1917, as amended, 50 U.S.C.A.Appendix, § 9(a), against the Attorney General of the United States, successor to the functions of the Alien Property Custodian, and to the property held by the latter, Executive Order No. 9788, October 14, 1946, 50 U.S.C.A. Appendix, § 6 note, 11 F.R. 11981.

It is necessary to furnish at least a brief statement of the facts out of which the controversy arose. Plaintiff is a resident of Syosset in the Eastern District of New York. On April 28, 1941, he received from one von Clemm $5,000, and on the same day executed a deed of trust, which is annexed to his bill. Under the terms of that deed, Alley was to administer the trust estate for the benefit of two children of von Clemm, Frederick Michael Clemm von Hohenberg and Alison Clemm von Hohenberg, both of whom are American citizens by birth. The citizenship of von Clemm, the grantor under the deed of trust, does not appear, but his residence is given as Syosset, Long Island. Immediately (April 28, 1941) upon the execution of the deed of trust, Alley invested the trust property in a limited partnership formed pursuant to Article VIII of the Partnership Law of the State of New York, Consol.Laws, c. 39. Von Clemm, the grantor under the deed of trust, was the sole general partner. His contribution to capital was $5,000 cash, and his interest in the firm, 50% of the profits and surplus. In addition, he received a weekly drawing account in the amount of $150. Alley and Lambercier, the latter being another limited partner and a Swiss national, each invested $5,000; each had a 25% interest in profits and in surplus. By the terms of the partnership agreement, which also forms part of the plaintiff's bill, the venture was to terminate on April 27, 1946, or sooner by the death of von Clemm, or by notice on his part at the end of any 12-month period subsequent to the date of the agreement. As a matter of fact, von Clemm is apparently alive and so is Lambercier, the other special partner, though neither is a party to this suit.

On December 31, 1942, Leo T. Crowley, then Alien Property Custodian, vested the partnership "interest" of each of the partners in the Bridge Import Company (Vesting Order 353). This was done on the basis of a finding that the partnership "interest" was held for the benefit of International Mortgage and Investment Corporation, an enemy national. On March 14, 1945, James E. Markham, then Alien Property Custodian, vested 263 packages of synthetic and semi-precious stones and ten industrial diamonds, assets of the Bridge Import Company (Vesting Order 4754). These assets were, on December 4, 1945, sold at public action by the Alien Property Custodian and brought $950,000.

Plaintiff alleges in his bill that the "net assets" of Bridge Import Company total about $815,000, and that since the partnership was by agreement terminated on April 27, 1946, he, the plaintiff, is entitled to recover his original contribution of $5,000 plus one-fourth of the remaining "net assets" of the partnership, making a total of $205,000. The Alien Property Custodian has refused plaintiff's demand for the return of his "interest".

The only question raised by the motion to dismiss is whether plaintiff, under the applicable statutes, is entitled to maintain this suit. It is, therefore, essential that these statutes be examined.

Originally, under the Trading with the Enemy Act of October 6, 1917, 50 U.S.C.A. Appendix, §§ 1–31, a person who was not an enemy, or the ally of an enemy, and who claimed any "interest, right, or title in any

money or other property" seized by the Alien Property Custodian or in his possession could, in the event of refusal of his demand for its return, maintain a suit in equity either in the District of Columbia or in the Court of his residence district, against the Custodian or the Treasurer of the United States to establish his interest, right or title, and to compel the return of the property involved, 50 U.S.C.A.Appendix, § 9(a). Such a suit was also permitted by a non-enemy "to whom any debt may be owing from an enemy or ally of enemy whose property or any part thereof" had come into the possession of the Alien Property Custodian, 50 U. S.C.A.Appendix, § 9(a). In other words, under the original act, it made no difference whether the plaintiff was seeking to establish an "interest, right, or title in any money or other property," on the one hand, or whether his claim was based upon a "debt" on the other. And Section 9(a) of the statute stands now as it stood in 1917, so far as this matter is concerned.[1] At all times between October 6, 1917, and August 8, 1946, given the other statutory conditions, a non-enemy could maintain a suit in equity in the district of his residence regardless of whether he was asserting an interest, right or title, or a debt claim.

But that situation was changed. Under the terms of a recent amendment, Public Law 671, Act of August 8, 1946, c. 878, § 1, 60 Stat. 925, 50 U.S.C.A.App. §§ 33–35 a new procedure was devised, which, so far as it is relevant here, denies to any debt claimant the right to sue in equity in his own district, and compels him to pursue and administrative procedure which this plaintiff has not followed. Court review of adverse action by the Attorney General is possible only in the District Court of the United States for the District of Columbia, and then only if the claimant has taken all the administrative steps required, 50 U.S. C.A.Appendix § 34(e, i).

And so the question whether the present bill is maintainable depends upon the solution of the problem whether plaintiff is claiming an "interest, right, or title," 50 U.S.C.A.Appendix, § 9(a), or is asserting a debt claim, 50 U.S.C.A.Appendix, § 34.[2] If the right of a limited partner to recover his original contribution and his share of the partnership surplus is a "debt", the complaint must be dismissed. And this is the argument which the defendant makes.

Section 9(a) of the Trading with the Enemy Act of October 6, 1917, has been construed in a great many decisions. But, as might be expected, very few of them are helpful here. This is because, except in unusual circumstances, it was, prior to August 8, 1946, unnecessary for any judge to make an analysis of the nature of the claim asserted, with a view to determining whether it sprang from an interest, right or title, on the one hand, or a debt, on the other. One of the unusual cases is Banco Mexicano de Commercio e Industria v. Deutsche Bank, 1924, 263 U.S. 591, 44 S.Ct. 209, 68 L.Ed. 465. There the plaintiff, whose bill had been dismissed, was not a citizen of the United States. Congress, amending the Trading with the Enemy Act on June 5, 1920, had provided that non-citizens could maintain suit on a claim only in the event that it "arose with reference to the money or other property" held by the Custodian, 50 U.S.C.A.Appendix, § 9(e). It was necessary, therefore, for the Court to pass upon the question whether the debt claim asserted by Banco Mexicano

---

[1] Section 9 of the original Trading with the Enemy Act has been amended in other respects, Act of July 11, 1919, c. 6, § 1, 41 Stat. 35; Act of June 5, 1920, c. 241, 41 Stat. 977; Act of February 27, 1921, c. 76, 41 Stat. 1147; Act of December 21, 1921, c. 13, 42 Stat. 351; Act of December 27, 1922, c. 13, 42 Stat. 1065; Act of March 4, 1923, c. 285, § 1, 42 Stat. 1511; Act of May 7, 1926, c. 252, 44 Stat. 406; Act of March 10, 1928, c. 167, §§ 11–14, 20, 45 Stat. 270–273; Act of August 24, 1937, c. 745, 50 Stat. 748.

[2] It seems odd that Congress did not delete from Section 9(a) the provision for suit by debt claimants when, on August 8, 1946, it set up a new procedure specifically applicable to debts, 50 U.S. C.A.Appendix, §§ 33–35. However, it did not. Judge Coxe has written on the subject (Cabell v. Markham, D.C.S.D. N.Y., 1946, 69 F.Supp. 640), and what he says is convincing on the point that Section 9(a) of the statute has been, in part, repealed by the Act of August 8, 1946, Public Law 671, 50 U.S.C.A.Appendix §§ 33–35.

did, in fact, "arise" with reference to the money in the hands of the Custodian, and the Court decided it did not. The transaction, which formed the basis for the claim, was held to be an ordinary business one, namely, a deposit. This created a pure debtor-creditor relationship between the claimant and the Custodian, and the fact that the former had reduced his debt to judgment, and under the laws of the State of New York had a right to attach the property of the debtor, did not convert his claim into one which "arose" out of the property in the hands of the Administrator, namely, the assets of the debtor bank. It is now necessary, since the enactment of Public Law 671, to classify every plaintiff's claim either as a debt or an interest, without such help from the existing decisions under the statute.

What law is to govern the decision? A limited partnership is a creature of statute, and this partnership was organized under the laws of the State of New York, Partnership Law, Art. VIII. Certainly, therefore, the local statutory rights of a limited partner have a strong bearing on the question that is here for decision. Under the federal statute as it formerly existed, usually the local law supplied the answer to any question concerning the nature of the plaintiff's claim against property in the Custodian's hands, even where that involved examination and application of German law (e. g., Bek v. Miller, 1925, 56 App.D.C. 36, 8 F.2d 797). On the other hand, it is also necessary to consider that Congress, when it used the words "interest, right, or title" and "debt," was here dealing only with the control and disposition of property seized by the Alien Property Custodian, and federal policy and the background of the statute is important.

Why did Congress on August 8, 1946, limit so narrowly the right formerly enjoyed by non-enemy claimants to bring suit on debts, and leave unimpaired their existing right to sue when there was involved an "interest, right, or title in any money or other property"? It seems that one of the principal reasons for the statutory change was the decision of the Supreme Court in Markham v. Cabell, 1945, 326 U.S. 404, 66 S.Ct. 193.[3] Cabell asserted in his bill a claim against the Custodian based upon legal fees owed by an enemy corporation. Literally read, Section 9(e) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 9(e), barred the suit, because the claim was not one which was "owing to and owned by the claimant prior to October 6, 1917." However, both the Second Circuit and the Supreme Court refused to apply the section literally. For the Trading with the Enemy Act of 1917 was, upon the outbreak of war in 1941, revived by operation of law. Thus the mere passage of the years had made nugatory the remedy given to debt claimants under Section 9(e), if the time limitations of Section 9(e) were given literal effect. It appears to have been argued by the government, both in the Second Circuit Court of Appeals and also in the Supreme Court, that to permit suit to be maintained was even so inequitable because, by reason of other post 1917 changes made in the statute, it had become possible to liquidate debt claims against enemies much more quickly than to carry out the same process against non-enemies. This was because, after the outbreak of the second world war, even assets belonging to subjects of friendly powers were frozen as a defense measure, a process not thought of during the first world war, and the unfreezing procedure was much slower and more onerous than the remedies available to the debt claimant under the statute as it originally stood. The Supreme Court recognized that this was an anomalous situation but, nevertheless, construed the act liberally and permitted the bill to be maintained. This led Congress to revise the procedures available to all debt claimants.

Briefly stated, one of the principles of the revision is that all precautions shall be taken to see to it that distribution of seized property to debt claimants shall be as equitable as possible—that the first to

---

[3] See Report of the House Committee on the Judiciary No. 2398, June 27, 1946, referring to H.R.6890 which subsequently became Public Law 671; United States Code Cong. Service, 79th Congress, Second Session, 1946, pp. 1467, 1475.

come shall not necessarily be the first to be served. It was pointed out to Congress that as of December 31, 1945, debt claims against seized assets aggregated $113,000,-000, whereas the value of the assets amounted to only $39,500,000. And this, it was said, afforded a "cogent demonstration * * * of the need for a system of pro rata payment." [4]

▮ Having in mind the background of the 1946 amendment, Public Law 671, 50 U.S.C.A.Appendix, §§ 33–35, I should, therefore, suppose that, if to apply the local definition of "debt" might be to defeat the policy and purpose of the Congress, then it would be necessary for the local law to yield. And, even if I am wrong in this, I nevertheless believe that, where there is any lack of clarity in the local standards of what constitutes a "debt" and what constitutes an "interest," any doubt must be resolved against the plaintiff and his claim must be classified as a "debt." To apply an opposite construction would be to narrow the field of equitable distribution of seized assets, and to widen the area in which the principle of "first come, first served" would be applicable. This belief of mine finds support also in the principle that a suit to recover property in the hands of the Alien Property Custodian is actually a suit against the United States. Therefore, the terms of the permission must be strictly followed, and the suitor's claim must come literally within the scope of the government's consent. Banco Mexicano de Commercio e Industria v. Deutsche Bank, 1923, 53 App.D.C. 266, 289 F. 924, 929, affirmed 1924, 263 U.S. 591, 44 S.Ct. 209, 68 L.Ed. 465. This means that now the plaintiff's claim must be clearly within the ambit of the words "interest, right, or title" if he is to avoid the procedural and administrative restrictions upon the collection of "debts." I do not believe that Markham v. Cabell, supra, represents any departure from this doctrine.

New York's present Limited Partnership Law was enacted in 1922. But for 100 years prior to that time, limited partnerships had existed in the state. Moor-head v. Seymour, 1901, City Ct., 77 N.Y.S. 1050, not officially reported. A number of decisions dealing with the rights of limited partners are to be found in the books, but plaintiff argues that most of them are not now to be considered precedents because they were handed down prior to the effective date of the existing statute. It seems to me, however, that this argument loses force when those cases are examined, because, so far as the "interest, right, or title" of the limited partner is concerned, there is no substantial difference between what the present law gives him, and what he had formerly, at least, as I read the cases. And the present Partnership Law contains several sections which hint very strongly that a limited partner has in many respects the same rights as a creditor. True enough, the limited partner, unlike other creditors, has rights of visitation, and can petition for a dissolution of the firm, Art. VIII, Sec. 99, sub. 1. However, in terms of money, he is entitled only "to receive" his share of the profits or his return of the contribution, Art. VIII, sec. 99, sub. 2. The interest of the limited partner is assignable, Art. VIII, sec. 108, and, on his death, his rights descend to his executor or his administrator, subject to his liabilities, Art. VIII, sec. 110. There are, moreover, two very significant provisions: (1) In the absence of an agreement to the contrary, a limited partner, no matter what the nature of his contribution may be, can receive only cash in return, Art. VIII, sec. 105, sub. 3, and (2) on distribution of assets he ranks between general creditors and general partners, Art. VIII, sec. 112. To be sure, the statute says that a limited partner's "interest" in a partnership is personal property, Art. VIII, sec. 107. But when the sections of the statute dealing with the rights of a general partner are examined, it is found that they employ language markedly different than that which delineates the rights of a limited partner.

The statute gives a general partner in a limited partnership the same rights as in a partnership without limited partners, Art. VIII, sec. 98, sub. 1. These rights are

---

4 See Report under footnote 3 at page 1476.

defined in a number of other sections in the partnership law. And those sections do not talk about the right of a general partner "to receive" his profits or contribution, but of the interest of that partner *"in* specific partnership property," and *"in* the partnership," Art. V, sec. 50 (italics supplied). Concerning specific property, a general partner is spoken of as a "co-owner," and his right of possession is clearly defined, Art. V, sec. 51. It is almost as if the framers of the state statute were using words of art to make a distinction between a jus in re in the general partner, and a jus ad rem in the limited partner. And, curiously enough, that same distinction is strongly hinted at in the very federal statute relevant here, 50 U.S.C.A.Appendix 9(a): "interest, right, or title in any money or other property," on the one hand, and "debt", on the other.[5] It may well be that both the state legislature in the Uniform Limited Partnership Act, and the Congress in the Trading with the Enemy Act of October 6, 1917, though dealing with different subjects, were setting up two categories, thought to be mutually exclusive, one relating to proprietary rights in the thing itself, coupled with a right to possession, and the other relating to rights against the thing, devoid of any incidents of ownership. And it would be wholly natural for trained lawyers to use such categories and to express themselves in this way instinctively. If this distinction was intended in both statutes, and I believe it was, then the rights of a limited partner, as defined in the state statute, must surely be more nearly akin to those of a creditor, as distinguished from those of an owner or lienor. And whatever the federal statute, as it now stands, concedes to a general partner in respect of permission to sue the Custodian, the intent was to treat limited partners otherwise. For this reason, the cases of Rossie v. Garvan, D. C.Conn., 1921, 274 F. 447, and Mayer v. Garvan, 1 Cir., 1922, 278 F. 27, heavily relied upon by plaintiff, are not really in point.

The decision in Mayer v. Garvan, supra, turned upon the fact that plaintiff was a general partner, who, it was held, had an equitable lien upon all of the American firm assets to secure his own distributive share and the payment of partnership debts. It was said that this lien was not cut off by certain transactions which had taken place in Germany, the purpose of which was to terminate the agreement among the partners, and to distribute the firm's assets among them, in the event of the outbreak of war. The Circuit Court of Appeals in Mayer v. Garvan, supra, does not cite any authority for its statement that Mayer, a general partner, had an equitable lien. But the District Court decision in the same case (Mayer v. Garvan, D.C.Mass., 1920, 270 F. 229, 238) cites a New Jersey case, which, in turn, relies upon New York and Massachusetts authorities, in support of the proposition that such an equitable lien exists in favor of a general partner. However, I have never seen it even asserted that a limited partner has a lien of that kind, and the New York statute is barren of any language which would create such a lien.

The New York authorities, including the older ones, are clear on the point, or so it seems to me, that a limited partner has no property right in the partnership assets. In Harris v. Murray, 1863, 28 N.Y. 574, the interest of a limited partner had been sold upon an execution, and the sale was attacked as invalid. Two opinions were written in the case. In one of these Judge Ingraham says (pp. 577, 578): "The interest of Harris in the property of a limited partnership can hardly be said to be an interest in the property of the firm. He advanced to the firm a sum of money which he is entitled to receive back with interest at the termination of the partnership. He is only entitled to a share in the profits. But he is to no further extent the owner of the property." Judge Denio says (28 N.Y. at pages 580, 581): "The interest of the plaintiff in the firm of Dougherty was not tangible prop-

---

[5] I fully appreciate that words like "interest," "right," "title," and "debt" are not invariants. I am simply trying to construe them against the statutory background, state and federal, relevant here.

erty, and could not be sold under an ordinary writ of fieri facias. It was in the nature of a thing in action which may be subject to the payment of the debts of the owner by a proceeding adapted to such a case; and the sole question is, whether such an interest was vendible under an execution except in a suit commenced against an absent debtor by attachment".

The whole theory of the plaintiff in the Harris case seems to have been that the interest, even of a limited partner, is analogous to that of a stockholder. But the civil law theory of a partnership as a juristic entity, so far as New York is concerned, "has never become domesticated, and has indeed been at times resisted, when there was considerable excuse for its adoption". Rossmoore v. Commissioner of Internal Revenue, 2 Cir., 1935, 76 F.2d 520, 521. In the case last mentioned, Judge Learned Hand was speaking of the interest of a general, not a limited, partner, and I mention the case only because, writing in 1935 after the enactment of the Uniform Partnership Law, Judge Hand expresses the same views as those to be found in the Harris decision in 1863. If it still be insisted that the Harris case is no precedent because of subsequent statutory changes, as plaintiff suggests, then I can only point to the resume of the rights of limited partners as they stood in 1863 given by Judge Ingraham in the Harris opinion, 28 N.Y. at pages 575, 576. They differ in no particular from the rights of limited partners as they stand today.

Rossie v. Garvan, supra, is a case in which all of the members of the partnership, as well as the Custodian, were before the Court. There were no limited partners, and the real point in the case was that German partnership law would not be applied when found to be in conflict with our own policy. Nothing in the decision supports the view that a limited partner has an interest, right or title in the assets of the partnership whether before or after dissolution.

Turning back to another New York decision (Skolny v. Richter, 1910, 139 App. Div. 534, 124 N.Y.S. 152), one finds the Court placing considerable stress on the circumstance that a limited partner has no right to interfere with the management of the concern (indeed he is penalized if he does), and on the further circumstance that the death of a limited partner does not work dissolution, as does the death of a general partner. Plaintiff says that the Skolny case was decided under the "old law", and this is true. But the difference between the statute considered in the Skolny case and the present Limited Partnership Law is certainly not very great. For example, under the former law, the purchaser from an assignee of a limited partner became a substitute limited partner without the consent of the other members of the firm; that is no longer true, Art. VIII, sec. 108, sub. 4; and this was one element of the relationship stressed in the Skolny case. But it was only one of the things that led the Court to say (124 N.Y.S. at page 157): "Indeed throughout the whole act, from whatever standpoint it may be viewed, the special partner, so far as concerns his relations to his general partners, is treated as a mere contributor of capital with none of the rights or liabilities belonging to general partners, such as universal agency, unlimited liability for debts, and a property interest in the firm name and good will."

Construing the act in this way, the Court held that a limited partner who acquired an interest, also as limited partner, in a competing firm was guilty of no such breach of good faith as would warrant dissolution of the first firm. As I have said, plaintiff seeks to minimize decisions like that in the Skolny case, because the statute was not the same then as now, but I am unable to find anything in the present statute which would change either the result or the reasoning of the Skolny case. Even the right of a limited partner to procure dissolution, Art. VIII, sec. 99(1) (c), is not incompatible with the rights of a general creditor. Continental National Bank of Boston v. Strauss, 1893, 137 N.Y. 148, 154, 32 N.E. 1066.

██ To summarize, having in mind the object and the policy behind the enactment of Public Law 671, and considering the rights of a New York limited partner against that background only, I hold that a limited partner has no such interest, right

or title in the property of the partnership as to permit his maintaining an action under Section 9(a), but that, on the contrary, such a limited partner has merely a debt claim against the assets in the hands of the Administrator to the extent of his contribution and his share of the profits, and subject to the claims of general creditors who are not limited partners.

Thus far, I have not spoken of one feature of this case which, it seems to me, presents a dilemma, so far as the plaintiff is concerned. If plaintiff does enjoy a proprietary interest in the partnership assets, it is difficult to see why his co-partners are not indispensable parties to the suit.[6] And a proceeding to admeasure the interest of a limited partner, assuming it to be jus in re, is surely one that could not proceed to decree in the absence of the other owners. Even where the interest sought to be reduced to possession consisted of stock certificates forming part of a pool, and the plaintiff was held to have equitable title to some of that stock, it has been said that all persons claiming shares of the same stock held by the Custodian are "necessary" parties. Pilger v. Sutherland, 1932, 61 App. D.C. 84, 57 F.2d 604.[7] And, as I have suggested, in Rossie v. Garvan, supra, all the partners were before the Court.

It is difficult to see how a proper decree could be devised in plaintiff's favor, decreeing ownership of one-fourth of the partnership surplus free of all claims of the co-partners who are not before the Court. I suppose plaintiff would answer this by saying that if he gets what he claims, he will be a trustee of any amount in excess of his proper share, not only for his co-partners but also for general creditors of the concern. But certainly, so far as co-partners are concerned, assuming plaintiff to be an owner, this was the very type of result that the doctrine of indispensable parties was calculated to prevent. The dilemma of which I spoke is, therefore, as follows: if plaintiff truly has an interest, right or title in the property, then his co-owners are indispensable parties, unless it could be said, which it cannot, that a limited partner has the same right as a general partner to act as a trustee in dissolution; on the other hand, if a limited partner's claim is for less than an interest, right or title in the property, and can be adjudicated by itself, then plaintiff must follow the administrative procedure, and exclusive remedy given him by the statute, 50 U.S.C.A.Appendix, § 34.

The complaint is, accordingly, dismissed. Submit order.

---

[6] Mayer v. Garvan, supra, seems to contradict this, and to hold that even in the absence of the co-partners, and even where the statement of an account was impossible, the general partner who brought suit was entitled to possession of all the partnership property. But this was by virtue of a specific provision in the Trading with the Enemy Act of October 6, 1917, which is now the same as it was then, 50 U.S.C.A.Appendix, § 8. It provides, among other things, that any person not an enemy or ally of an enemy who holds a mortgage, pledge, or lien, or other right in the nature of security in property of an enemy or ally of an enemy which, by law, or by agreement could be disposed of on notice or presentation or demand, may continue to hold the property, and dispose of it and turn any surplus over to the Custodian. It was held that by virtue of his status as a general partner, Mayer had an equitable lien which brought his case within the terms of the statute just paraphrased and entitled him to a decree for possession. It is not contended here that plaintiff has any such right.

[7] One feature of the administrative procedure for the distribution of assets among debt claimants, as distinguished from persons possessing an interest, right or title, is that by which the Attorney General may bar the filing of debt claims, 50 U.S.C.A.Appendix, § 34(b); Executive Order 9788, 18 F.R. 18981. After the argument of this motion, it was learned that June 1, 1947 has, in fact, been fixed as the bar date with respect to debt claims related to the seizure here involved, 12 F.R. 1448. I do not find any analogous procedure applicable to suits based upon a claim of interest, right or title in the property. The mere fact that such a procedure does not exist, except as to debt claims, strongly suggests that co-owners or those with analogous rights, ought to be made parties, i. e., where the claim is something more than a mere debt.