**MASAMI SASAKI, Plaintiff**

v.

**William P. ROGERS, Attorney General of the United States, Defendant.**

**Civ. A. No. 3229-58.**

United States District Court
District of Columbia.

June 24, 1960.

Thomas H. Carolan, Carolan & Mc-Hugh, Philip W. Amram, Amram, Hahn & Sundlun, Washington, D. C., for plaintiff.

Dallas S. Townsend, Asst. Atty. Gen., for defendant.

LEONARD P. WALSH, District Judge.

Pursuant to designation as a special judge in the matter here involved, the Court heard oral argument on May 25, 1960, on a motion for summary judgment filed by the defendant on January 11, 1960.[1] The motion was based on the pleadings and the certified transcript of proceedings in the Office of Alien Property.

The salient facts are as follows: The plaintiff, Masami Sasaki, was born in Japan in 1888 and immigrated to this country some time prior to 1941. He was living in Huntington Beach, California, on December 7, 1941, on which date the President issued Proclamation No. 2525, U.S.Code Cong.Service 1941, p. 885, declaring certain citizens of Japan, over 14 years of age and residing in this country, were to be termed enemy aliens. The Attorney General, under the Alien Enemy Act, 50 U.S.C.A. § 21, and the Presidential Proclamations of December 7 and 8, 1941, Nos. 2525-2527, U.S.Code, Cong.Service 1941, pp. 885, 889, 891, 6 Fed.Reg. 6321, 6323 and 6324, was delegated authority to intern, in his discretion, all resident alien enemies whom he considered dangerous to the public safety of the United States.

On December 7, 1941, the police contacted plaintiff at his home in Huntington, California, and he was taken into custody without warrant for "questioning".[2]

The plaintiff claims that he was subsequently moved to Missoula, Montana, where he was given his first hearing, and said hearing lasted only 5 or 10 minutes. In August, 1942, he was moved to a camp in Livingston, Louisiana, where he was given another hearing, which lasted from 3 to 4 hours, and at which, apparently, certain information was provided for the hearing officer by representatives of the Federal Bureau of Investigation.[3]

1. The Government moved for the assignment of a special judge in five cases involving the insolvent estate of The Sumitomo Bank, Ltd., for the reasons, among others, that the Government believed no final judgment could be entered in any one case until all were disposed of. It was considered that the final judgment in each case would affect the pro rata schedule outlined by the Alien Property Custodian for the disposition of the insolvent bank's funds. Therefore, since the cases are interrelated, it was considered that the determination of the five cases should all be made part of a final order which would incorporate a final schedule and that would be clearly appealable as a final judgment.

2. Plaintiff was at the time vice president of the Central Japanese Association of Southern California and president of the Smettzer Japanese Association.

3. The transcript of record of proceedings in the Office of Alien Property contains a letter written by plaintiff, dated April 22, 1958, wherein he states in part: "After the hearing I asked the officer why they did not release me, and the officer explained that I should ask for such a release by filing a petition. Although I did not make such a petition

The plaintiff further alleges as follows: that in June, 1943, he was sent or permitted to go to Santa Fe, New Mexico; on January 17, 1944, an order of parole was issued to him by the Attorney General; in March, 1944, he was transferred to Granada, Colorado; in May, 1944, he was transferred to Tule Lake, California; and on December 5, 1945, he was released from the relocation center, and returned to make his home at 203 Weller St., Los Angeles, California. The passage of the Walter-McCarran Act, 8 U.S.C.A. 1101 et seq., which opened United States citizenship to Japanese nationals, was immediately availed of by the plaintiff, who became a naturalized citizen on January 14, 1955.

The plaintiff filed a Notice of Claim for Return of Property (No. 5687) on September 16, 1946, which was amended and consolidated with Claim No. 33744, filed on January 30, 1948, in accordance with the provisions of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 34 et seq., for the return of $42,075.-52, plus interest,[4] which sum plaintiff had deposited in The Sumitomo Bank, Ltd., a Japanese corporation engaged in business in the United States. The assets of said bank were seized under the Trading with the Enemy Act by the Alien Property Custodian in 1943.

The Government contends the plaintiff was an internee and parolee, and therefore not an eligible debt claimant. On July 14, 1942, the plaintiff by an Order of the Attorney General, upon recommendation of the Alien Enemy Hearing Board, was interned as an alien enemy. In a subsequent order of the Attorney General, dated January 17, 1944, the internment order was vacated, and the plaintiff was paroled, subject to parole restrictions, and was transferred to a War Relocation Center as noted earlier. This action was never rescinded or overturned.

Plaintiff here has exhausted his administrative remedies in a series of applications, letters, etc., spanning a number of years. In a letter dated January 9, 1957, the Chief of the Claims Section, Office of Alien Property, found the plaintiff ineligible as a debt claimant and informed him of the procedure to be followed upon dismissal of a claim.[5] The plaintiff filed timely objections to the dismissal of his debt claim on February 4, 1957, on the grounds (1) that under the community property laws of California his wife (who was not interned) was entitled to recover one-half of his claim, (2) his citizenship acquired in January 14, 1955 had the effect of reversing his internee-enemy alien status, and (3) since Congress, by act of 1956, authorized the payment of evacuation claims to all internees whose evacuation claims have not been paid by reason of their internment, plaintiff's ineligibility to the debt claim should also be lifted. The Chief of the Claims Section affirmed his earlier dismissal of plaintiff's claim by letter of February 11, 1957, but indicated he would amend the plaintiff's claim, and show it to assert the one-half claim of his wife. However, in a letter dated October 31, 1957, the Claims Section notified plaintiff that since the wife had not filed a claim prior to November 18, 1949, her claim was ineligible under

---

the Department of Justice released me from detention during 1943, and I joined my wife at the Amache Relocation Center."

4. Item 9 of plaintiff's amended Notice of Claim for Payment of Debt, reads as follows: "It is alleged by claimant hereto that an oral agreement existed at all times herein specified whereby depositor (claimant) was to be paid in lawful money of the United States at the Sumitomo Bank, Ltd."

5. The letter reads in part as follows: "Under section 34(a) of the Trading with the Enemy Act (50 U.S.C.App. 34 (a)) persons who were paroled or interned under the Alien Enemy Act (50 U.S.C. 21) are not eligible as debt claimants. It appears that you were interned under the Alien Enemy Act by Order of Attorney General dated July 14, 1942, and paroled by Order dated January 17, 1944. Consequently, you are not an eligible debt claimant and no favorable action with respect to your claim is possible by this office."

Section 34 of the Trading with the Enemy Act. Plaintiff took objection to the latter ruling on the ground, among others, that the ruling of "internee" in his case was arbitrary and should have no legal effect. The Chief of the Claims Section, on February 10, 1958, affirmed his October 31, 1957, and former rulings. He also indicated that he was applying to the Custodian of the Alien Property Fund for an order to dismiss the claim.

The Deputy Director of the Office of Alien Property upon "the application of the Chief of the Claims Section and after considering the objections filed by the claimant and finding that no genuine issue is raised thereby and that the * * * claimant is not eligible to maintain a debt claim" ordered the claim dismissed and disallowed on June 19, 1958.[6] He also directed that since the debt claims filed against The Sumitomo Bank exceeded the funds held by his Office, any further proceedings were to be governed by section 34(f) of the Trading with the Enemy Act.

Thereafter, on October 24, 1958, the Deputy Director signed the Final Schedule in the Matter of the Insolvent Account of The Sumitomo Bank, Ltd. The plaintiff's claim was not among those allowed, and plaintiff filed a complaint for review of the Final Schedule pursuant to section 34(f) of the Trading with the Enemy Act.

The plaintiff, in answer to defendant's motion here, states his argument as follows: "Plaintiff is an eligible claimant under Section 34 of the Trading with the Enemy Act, because that Section permits every resident alien to recover, if he has not been 'interned or paroled *pursuant* to the Alien Enemy Act.' (Emphasis supplied.) This means *validly* and *correctly* interned or paroled. It does *not* mean *erroneously* or *unlawfully* interned or paroled." Plaintiff also asserts that the fact he was subsequently naturalized

as a citizen is evidence that he was not deserving of internment.

The pertinent statutes involved in this controversy are section 21 of the Alien Enemy Act and section 34(a) and (f) of the Trading with the Enemy Act. Section 21 of the former Act reads in part as follows:

"Whenever there is a declared war between the United States and any foreign nation * * * and the President makes public proclamation of the event, all * * * subjects of the hostile nation * * * being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies. The President is authorized * * * by his proclamation * * * to direct the conduct to be observed, on the part of the United States, toward the aliens who become so liable; the manner and degree of the restraint to which they shall be subject and in what cases, and upon what security their residence shall be permitted * * * and to establish any other regulations which are found necessary in the premises and for the public safety."

The pertinent portion of Section 34(a) of the Trading with the Enemy Act reads as follows:

"Debt claims allowable hereunder shall include only those of citizens of the United States * * *; those of other natural persons who are and have been since the beginning of the war residents of the United States and *who have not during the war been interned or paroled* pursuant to the Alien Enemy Act * * *." (Emphasis supplied.)

Section 34(f) of the Trading with the Enemy Act provides, as noted earlier,

---

6. Counsel for plaintiff forwarded a letter, May 2, 1959, to the Office of Alien Property objecting to the Claim Section's determination and the Deputy Director reviewed those objections before signing his order of June 19, 1958. Among the claims made therein was that plaintiff was interned without formal charges and without an opportunity to refute charges made against him.

for the pro rata payment of claims where the aggregate of debt claims filed exceeds the money from which payment may be made; for preparation by the Custodian of a schedule of all debt claims allowed and proposed payments to each claimant; and for judicial review of such schedule, by the filing of a complaint in the United States District Court for the District of Columbia, naming the Custodian of Alien Property as defendant, and providing that the Custodian shall file with the Court a complete transcript of the record of proceedings before the Office of Alien Property. It also provides that the court may, in its discretion, take additional evidence upon a showing that such evidence was offered to and excluded by the Custodian, or could not reasonably have been adduced by him, or was not available to him; and that the Court shall enter judgment affirming or modifying the schedule prepared by the Custodian and direct any payment which it may find due to the claimant.

■ The Court here agrees with the interpretation placed by the Government on section 34(a) of the Trading with the Enemy Act, i.e., that the statutory language is plain, unambiguous, and clearly means that all alien enemies who have been interned or paroled pursuant to the Alien Enemy Act are ineligible claimants.

■ The Plaintiff claims that the legislative history (Senate Report 1839, 79th Congress, 2nd Session) referring to section 34(a) indicates that only those *deserving* of internment were meant to be excluded as claimants. The defendant, on the other hand, cites other legislative history to the effect that the term "deserving of internment" was merely intended to describe those who had actually been interned. Hearings on H.R. 5089, 79th Cong., 2nd Sess., 1946, p. 131; Hearings on S. 2378 and 2039, 79th Cong., 2nd Sess., 1946, Appdx., p. 34; Senate Report 1839, 79th Cong., 2nd Sess., 1946, p. 5; and H.R. Report 2398, 79th Cong., 2nd Sess., 1946, p. 11.

With respect to such claim, the Court of Appeals of this Circuit was faced with a construction of the Trading with the Enemy Act in a somewhat similar case, Banco Mexicano de Commercio e Industria v. Deutsche Bank, 1923, 53 U.S. App.D.C. 266, 289 F. 924, 928, affirmed 1924, 263 U.S. 591, 44 S.Ct. 209, 68 L.Ed. 465, where the court said:

"Attention has been called to the report of the House committee on interstate and foreign commerce, in charge of the bill which became the Act of June 5, 1920. From the report and the communications from the Attorney General's office and the State Department, to which reference is made in the report of the committee, it might be inferred that Congress in this act had in mind the granting of a right of action for debts incurred in this country, whether the claimants be citizens or aliens. If Congress had this intention, it could have been expressed in the act; but, inasmuch as no such intention can be drawn from the language of the act, we are not authorized, from the mere statements contained in the report of the committee, either to read such an inference into the act or to presume such an intent by Congress * * *."

This Court is satisfied that the claimant does not meet the conditions of the statute (see the Supreme Court opinion, 263 U.S. at page 601, 44 S.Ct. at page 211), i.e., he was in fact interned and paroled during the war. However, even if this Court were to go further and interpret the claimant's reference to the legislative history, it concludes that the words "deserving of internment" as used in Congressional reports was merely intended to describe those actually interned. There is no indication, as suggested by the plaintiff, that a person need be engaged in "cloaking activities" or "aiding or abetting" the enemy in order to warrant internment under the

enemy control program administered by the Attorney General.[7] As noted by the Government in its oral argument, the mere fact that a person was interned is no indication that he was in any way engaged in espionage work, etc. Some Japanese aliens were apparently interned if they were leaders of their communities and leaders in Japanese-dominated organizations, as was the plaintiff here, and were persons who might favor their hostile nation during the war and thus sway the opinions of those in lesser positions.

■ The Court is also satisfied that the word "pursuant" as used in Section 34(a) of the Trading with the Enemy Act means merely that internment or parole, pursuant to the Alien Enemy Act, must be conformable to, or in prosecution of, the latter act. Webster's New International Dictionary, 2d ed., 1939. It does not mean, in this Court's opinion, that in a proceeding under the Trading with the Enemy Act that a court must review or go behind the findings and orders made under the Enemy Alien Act to determine whether they were "merited" or otherwise ought to have been made.

As noted earlier, the President, pursuant to section 21 of the Enemy Alien Act, by Proclamations Nos. 2525–2527 dated December 7 and 8, 1941, supra, delegated to the Attorney General the authority to intern, in his discretion, all resident alien enemies whom he deemed dangerous to the public peace and safety of this country. United States ex rel. Schwarzkopf v. Uhl, 2 Cir., 1943, 137 F. 2d 898, Citizens Protective League v. Clark, 1946, 81 U.S.App.D.C. 116, 155 F. 2d 290, certiorari denied 1946, 329 U.S. 787, 67 S.Ct. 354, 91 L.Ed. 674, Article

7 of the Regulations issued in connection with the Proclamation of December 7, 1941. The power of the Attorney General was thus limited to persons who were found in fact to be enemy aliens, and, if a person interned considered that he was being unlawfully detained as, or found to be, an internee, he could seek his release by filing a writ of habeas corpus.[8] United States ex rel. Schwarzkopf v. Uhl, supra.

On the basis of the foregoing, the Court rejects the plaintiff's argument urging this Court to analogize section 32 of the Trading with the Enemy Act with section 34 thereof, and holds as irrelevant the argument that the subsequent naturalization of plaintiff is evidence of his not "deserving" internment under the Alien Enemy Act.

Neither is the Court concerned with any argument of the Government that admitting this claim would open the floodgates to other claims, or that it would necessitate the republishing of the final schedule. Right and justice would take precedence in this Court, in any case, over such considerations as the latter were they germane to the question before the Court. However, such arguments do not, in the Court's opinion, enter the case here.

The Court finds here that there is no additional evidence which was "offered to and excluded by the Custodian or could not reasonably have been adduced before him or was not available to him." 50 U.S.C.A.Appendix, § 34(f). The record in the case shows plaintiff was interned and later paroled pursuant to the Alien Enemy Act, and that he sought no writ of habeas corpus in an effort to have set aside the determination of the Attor-

7. The Government claims that the Attorney General exercised his authority of internment delegated by the President very sparingly: "Of the pre-war Japanese alien population of 47,305, only 5,421 or 11.46% were apprehended by the Federal Bureau of Investigation under Alien Enemy proceedings. As of December 31, 1943, 1,573 Japanese alien enemies were interned, 2,058 paroled, and 421 released in Alien Enemy proceedings. Thus, the ineligibility of alien enemy internees or parolees under Section 34 affects only a very small percentage of the resident Japanese population. Moreover, each alien enemy apprehended under Alien Enemy proceedings was given a hearing before an Alien Hearing Board and his case reviewed in Washington before a final decision as to internment, parole, or release was taken."

8. See footnote 3, supra.

ney General with respect to his detention.

Meanwhile, the plaintiff here admits that the determinations of the Attorney General and all other proceedings took place and resulted as stated in the pleadings and papers on file in the case. Plaintiff now merely denies that those proceedings were legally effective as administrative and/or quasi-judicial proceedings or orders, which resulted in his internment and parole, and wherein he did not seek a review thereof by means of a writ of habeas corpus. The result is that the only questions left for decision are of law. Fletcher v. Evening Star Newspaper Co., 1940, 72 U.S.App.D.C. 303, 114 F.2d 582, certiorari denied 1941, 312 U.S. 694, 61 S.Ct. 732, 85 L.Ed. 1130. See also this Court's recent opinion in an analogous situation granting a motion for summary judgment, which the Court of Appeals has not yet reviewed, Lark v. West et al., D.C.D.C.1960, 182 F.Supp. 794.

Therefore, under Rule 56(c), 28 U.S. C.A., there being no genuine issue of material fact, the moving party (defendant) is entitled to summary judgment as a matter of law. See Straehler v. Brownell, 1957, 100 U.S.App.D.C. 394, 246 F. 2d 675.

▇ An action under the Trading with the Enemy Act, asking for a review of a final schedule of claims, pursuant to section 34(f), cannot also be used as a substitute for an action (a writ of habeas corpus) which the plaintiff here could have sought under the circumstances as they arose in earlier proceedings arising under the Alien Enemy Act.

Meanwhile the Court cannot speculate as to whether the claimant was "correctly" assigned his internee and parolee status which the Attorney General found fit to accord him on the grounds that he was deemed dangerous to the public peace and safety of this country during the recent hostilities. Lark v. West, supra.

There being no genuine issue of material fact in this case, no finding of arbitrary or capricious action on the part of the Alien Property Custodian, nothing in the record certified to the Court by the Alien Property Custodian which would incline the Court to interfere with the decision of the Director of Alien Property, and no additional evidence, or "evidence showing that * * * evidence was offered to and excluded by the Custodian or could not reasonably have been adduced before him or was not available to him," the defendant is entitled to summary judgment as a matter of law.

Counsel for the Government will prepare an appropriate order for submission to the Court.