ROYAL EXCHANGE ASSURANCE, Trustee under Trust Deed and Supplementary Trust Deeds dated December 6, 1925, July 30, 1926 and July 30, 1929 from Deutsches Kalisyndikat G.m.b.H. to Royal Exchange Assurance, Plaintiff,

v.

Herbert BROWNELL, Attorney General of the United States of America, successor to the Alien Property Custodian, Defendant.

United States District Court
S. D. New York.
Nov. 21, 1956.

See also 13 F.R.D. 150.

---

Cahill, Gordon, Reindel & Ohl, New York City, for plaintiff. Mathias F. Correa, William W. Dulles, Peyton H. Moss, New York City, of counsel.

Dallas S. Townsend, Asst. Atty. Gen., Paul W. Williams, U. S. Atty., S. D. N. Y., New York City, James D. Hill, Irving Jaffe, Max Wilfand, William V. Redmann, Washington, D. C., for defendant.

WEINFELD, District Judge.

The plaintiff, Royal Exchange Assurance, a British corporation, brings this action under the Trading With the Enemy Act [1] to recover $6,184,640.54 vested by the Alien Property Custodian as property of the Deutsches Kalisyndikat (hereafter called "Syndicate"), a German corporation.

The essence of the plaintiff's claim is that as trustee for bondholders under certain deeds of trust executed by the Syndicate it had an interest, right or title in the funds at the time of vesting and the funds should therefore be paid over to it as trustee for the benefit of the bondholders. The defendant asserts that

1. 50 U.S.C.A.Appendix, § 9(a).

at the time of vesting the funds were the property of the Syndicate and the plaintiff is merely a general creditor. Thus the hard core of the case is the nature of the plaintiff's interest, if any, in the funds.

The controversy has its origin in a loan made to the Syndicate which had been organized under the Weimer Republic and which had a monopoly of the sale of all potash produced in Germany. All producers of potash were required to be members of the Syndicate which sold the product in domestic and foreign markets. The export sales were made through sales agencies in various countries of the world.

In 1925 representatives of the Syndicate negotiated with a group of English and affiliated bankers headed by J. Henry Schroder & Company of London (hereafter called "Schroder") for a loan. The negotiations resulted in an agreement dated December 4, 1925 between the bankers and the Syndicate whereby the bankers agreed to underwrite the sale of bonds in the sum of £15,000,000 to be issued in three series, designated as Series A, Series B, and Series C. Series A, the first of the series of loans, in the sum of £8,000,000, was covered by the agreement of December 4, 1925.

The agreement in general embodied the terms of the loan, the relative rights and obligations of the Syndicate and the bankers, and provisions intended to secure the payment of the bonds. A feature of the loan agreement and the one which is at the heart of this controversy, was the commitment of the Syndicate that, in addition to security consisting of certain mortgages and guarantees executed by Syndicate members, the proceeds of all export sales of potash were to be available in the first instance for the payment of interest and sinking fund requirements. The Syndicate, to effectuate that purpose, agreed to the appointment of a receiving bank to receive the proceeds of exported potash sales and to supervise their disposition in accordance with the terms of the arrangement.

The plaintiff, Royal Exchange Assurance, was not a party to the loan agreement between the bankers and the Syndicate. However, the loan agreement required the Syndicate to enter into an indenture with the Royal Exchange Assurance as trustee; accordingly, on December 6, 1925, a trust deed was executed between the Syndicate and Royal Exchange Assurance which in effect implemented the Syndicate's specific undertakings as set forth in the loan agreement.

The Syndicate conveyed to Royal Exchange Assurance as trustee, mortgages executed by members of the Syndicate on their respective properties as security for the bond issue. The trust deed also contained a provision for the designation of a receiving bank substantially similar, but not identical, to that contained in the loan agreement. Schroder was designated as the receiving bank in both documents; it was also appointed as principal banker or paying agent for the distribution of interest on the bonds and to administer the payment of principal through the operation of a sinking fund.

Series B, the second of the loan series, was in the sum of £4,000,000 and was formalized by an agreement dated May 1, 1926. The bonds issued thereunder carried the same interest rate and maturity date as the Series A bonds.

Series C, the balance of the loan in the sum of £3,000,000, was covered by an agreement dated June 21, 1929. This series had a different rate of interest and a different maturity date from that of Series A and B.

The loan agreements under which the Series B and C bonds were issued are substantially similar to the original loan agreement. The Syndicate, as required by the second and third agreements, also entered into trust indentures with the plaintiff, Royal Exchange Assurance, as trustee, which are referred to respectively as the first supplementary trust deed and the second supplementary trust deed, each of which incorporates by ref-

erence the terms and provisions of the principal trust deed, mutatis mutandi.

### The Principal Trust Deed

The principal trust deed provides for (1) the issuance of the bonds; (2) security for the loan; (3) the receiving bank system; (4) payment of interest and sinking fund requirements; (5) events of default; (6) consequences of default; and (7) the duties of the bankers, receiving bank, Syndicate, and the trustee. Bearing most directly on the controversy are the provisions for the receiving bank system, and for the payment of interest and sinking fund requirements.

#### A. The Receiving Bank System

The receiving bank system and its operations are provided for as follows:

"Article Fifth. The Receiving Bank

"Section 14.—The Company shall at all times during the currency of the Loan appoint such person firm or corporation (hereinafter called 'the Receiving Bank') as the Bankers shall from time to time require for the purpose of supervising the disposal of the proceeds of the sale of all potash exported either directly or indirectly to countries outside the German Reich at any time whilst the Bonds or any of them shall be outstanding and all the costs charged and expenses of the Receiving Bank in connection therewith shall be paid by the Company. The Company with the approval of the Bankers hereby appoints J. Henry Schroder & Co. of London England to be the Receiving Bank. The Company undertakes that during the currency of the Loan it will give all such authorities and directions and do all such acts and things as shall be necessary to ensure that all proceeds of the sale of potash so exported shall be received by the Receiving Bank or by its nominees approved by the Company. All such proceeds so received shall be held by the Receiving Bank or by its nominees upon trust firstly to set aside in every calendar month a sum sufficient at the time of each such setting aside to provide one-twelfth of the amount required for the annual service

of the bonds and to pay the same in accordance with the provisions of Article Sixth hereof (for which purposes the proceeds of the sale of potash exported to the United States of America and Great Britain shall be utilised in the first place) and secondly to hold the remainder (after making up any sum by which such proceeds in previous months have been insufficient to provide such one-twelfths and after retaining all sums payable under Section 15 clause (c) hereof and deducting all costs charges and expenses then due and payable to the Trustees and the Bankers hereunder) at the disposal of the Company."

#### B. Payment of Interest and Sinking Fund Requirements

The payment of semi-annual loan service requirements is provided for as follows:

"Article Sixth. Payment of Interest on and Sinking Fund for 7% Series A Bonds

"Section 15. * * *

"(a) At least twenty-eight days before the 1st day of May and the 1st day of November in every year commencing with the 1st day of May 1926 the Company shall procure that the Receiving Bank shall pay for the service of the 7% Series A Bonds the sum of £348,112 to the English Bankers as paying and sinking fund agents together with any sum then payable under clause (c) of this Section and if on the due date of any such payments the funds in the hands of the Receiving Bank shall be insufficient to make such payment the Company shall within three days of notification by the Receiving Bank pay such deficiency to the Receiving Bank.

"The principal of the Bonds shall immediately become payable if any such payment shall not have been made seven days before the said 1st day of May or 1st day of November as the case may be."

Section 15(b) requires the English bankers to apply, after payment of interest, the balance of the loan service to a sinking fund operation for the redemption of bonds through purchase in

the open market, if available, and if not, by call through drawings.[2]

The semi-annual service requirements for the Series A and B bonds were £522,168 and for Series C it was £126,721—a total of £648,889; the monthly service requirements for all three series were £108,148.

### The Receiving Bank Arrangement

*A. Operation of Receiving Bank System from Inception of Loan to 1931*

The Syndicate exported potash principally to the United States, the British Commonwealth, Japan, Denmark, Belgium, Holland, Norway, Sweden and Switzerland. Since Schroder had no established correspondent in some of these countries it was necessary to appoint nominees or sub-receiving banks to receive the proceeds of sales of the exported potash. Nominee banks were appointed pursuant to a procedure which appears to have been followed in all instances. They were chosen by the Syndicate and Schroder. The Syndicate notified the selected bank that it had been designated as a nominee bank and that the Syndicate had instructed its sales agencies to make payment of the proceeds of export sales to it to be held for the Syndicate's account, but at the disposal of Schroder. In turn, Schroder advised the nominee or sub-receiving bank that it was released, for the time being, from its obligation to hold the proceeds at Schroder's disposal and instead was authorized to dispose of the proceeds on instructions from the Syndicate. Schroder, however, specified that it reserved the right to revoke this arrangement and to require the nominee bank to hold the proceeds at its (Schroder's) disposal.

The simultaneous designation and release of the nominee banks was apparently dictated by practical difficulties encountered almost from the inception of the loan by both Schroder and the Syndicate in carrying out the precise letter of the receiving bank provision. The procedure was adopted when it appeared that the sterling and dollar proceeds from sales generally would be sufficient to meet loan service requirements.

The arrangement for the simultaneous designation and release of the nominee banks was known to Royal Exchange Assurance, the plaintiff, which at no time requested the discontinuance of the practice.

In September, 1926 Continentale Handelsbank N.V. of Amsterdam, Holland (hereafter referred to as "Contibank") was designated as a nominee—in fact it became the principal nominee bank. Following its appointment, Contibank received export potash proceeds in many currencies, including dollars, which were credited to various accounts maintained by it.

From the inception of the loan in 1926 to 1931 the receiving bank system functioned generally as follows:

Schroder as receiving bank received the sterling proceeds of potash exports from Syndicate sales agencies in the United Kingdom which together with dollar balances furnished by Contibank were sufficient to meet the monthly service requirements of the loan.

As receiving bank, Schroder maintained a Receiving Bank Account, Loan Service Accounts, and a Special Deposit Account. Upon receipt, the cash proceeds were credited to the Receiving Bank Account but each month as soon as that Account contained £108,148, the monthly requirement for all three series, it was closed and the amounts allocable to each of the series of bonds were transferred to the Loan Service Accounts for the respective series. Any balance remaining in the Receiving Bank Account, together with any further potash proceeds received by Schroder during that month, were then transferred to the Special Deposit Account. When the Loan Service Accounts had six months accumulations in them, then twenty-eight days before the respective due dates of payment to bondholders, the deposits were transferred to Dividend and Redemption

---

2. Series C required redemption in the first instance by drawings.

Accounts which Schroder as principal paying agent maintained for each series. Payment of interest and redemptions were made out of these accounts. Until 1931 the loan service requirements were generally met as above described.

B. *Servicing of Bonds from 1931 to September, 1939, the Outbreak of World War II*

In 1931 due to disturbing world economic conditions and exchange restrictions in Europe generally and in Germany in particular, Schroder decided to revoke (and so notified the Syndicate) the arrangements made upon the original appointment of the nominee banks so that thereafter the potash proceeds would be held at Schroder's, instead of the Syndicate's, disposal.

The Syndicate desired to avoid this situation which, in addition to other disadvantages, would have involved excessive bookkeeping. In August, 1931 Diehn, its managing director, and Frohnknecht, co-manager of Contibank, conferred with Schroder's representatives. As a result they concluded arrangements whereby Syndicate undertook that Schroder as receiving bank would receive monthly in advance £110,-000 to cover the allocation due by the end of the following month.[3] In view of this arrangement Schroder did not carry through its announced purpose to cancel its original instructions to the nominee banks.

The procedure for the monthly advance payment operated generally in the following manner: Schroder issued daily advice to the Syndicate as to the sum it (Schroder) had on hand representing the proceeds of potash sales received by it from the Syndicate customers in the United Kingdom. On or about the 25th day of each month the Syndicate in-structed Contibank to send the difference between what Schroder had on hand and £110,000; Contibank then remitted this sum to Schroder before the end of the month with instructions to use it together with the amounts Schroder already had on hand to cover the £110,000 advance payment.

It is desirable to consider the source of the funds remitted by Contibank to make up the monthly balance and also Contibank's relationship with the Syndicate. Contibank was the general banker for the Syndicate.[4] The Syndicate as a depositor maintained with Contibank a general account from which it drew funds for its general purposes. In 1932 a Deposit Account was opened which also was drawn upon for such purposes.

Following its designation in 1926 as a nominee bank, Contibank credited the proceeds of the export sales to the Syndicate's general account. But in 1927 an account entitled Receiving Bank Account was opened and thereafter until 1934 all dollar potash proceeds received by Contibank were credited, in the first instance, to that Account and the monthly remittances sent by Contibank to Schroder were drawn from it. The Account was also drawn upon during this period for a transfer of funds to Syndicate's general account and Deposit Account for purposes unrelated to the loan; in some instances remittances were also made out of the Receiving Bank Account directly to third parties on the specific instructions of the Syndicate.

The Receiving Bank Account was maintained on the regular bookkeeping records of Contibank. It was known and disclosed; in other words, a non-secret account.[5] But in September, 1934 on Syndicate's instructions a secret account,[6] called Special Receiving Account,

---

3. The monthly allocation under the three loans was £108,148; the increased amount included a sum sufficient for exchange differences and costs.

4. The Syndicate owned fifty percent of Contibank's common stock and two of the bank's five directors were nominees of the Syndicate.

5. The usual bank statements were regularly sent to the depositor.

6. The secret accounts were maintained on books available only to special clerks in the Bank and no statement was mailed to the depositor, who would call at the Bank and there check and sign his statements.

was opened on Contibank's books. This Account was set up because the Syndicate officials became concerned that Germany's program of restrictive foreign exchange clearing agreements, if extended to all countries to which potash was exported, might jeopardize the Syndicate's ability to maintain the loan service and impair its international credit position.[7] Thereafter all dollar potash proceeds derived from export sales in the United States and Japan[8] were credited, in the first instance, to the secret Special Receiving Account which contained only such dollar proceeds. Funds were transferred from that Account to the disclosed Receiving Bank Account as if they had been received directly from Potexma or from Nippon, the Syndicate's sales agencies. Funds were then transferred from the Receiving Bank Account to the Deposit Account upon which Contibank drew for remittances to Schroder to make up the monthly advance payments.

The secret Special Receiving Account remained an active one until September 14, 1939 when on Syndicate's instructions the dollar balance ($15,999,350.02) therein was transferred to Securitas, a wholly-owned subsidiary of Contibank, where a new account was opened and designated Special Account. This account was also maintained as a secret account. We shall have occasion further to consider the Securitas Special Account in connection with the funds which were vested and are the subject of this action.

C. *The Outbreak of World War II and Developments Thereafter*

The 1931 arrangements for the monthly advance payment continued in practice until the outbreak of World War II between England and Germany. Contibank had made the necessary remittances at the end of each month through August, 1939. The advance payment for the month of October, 1939 (which normally would have been made not later than September 30th) was not made until October 3, 1939 under circumstances hereinafter discussed.

On September 4, 1939, the day following the outbreak of war, Schroder notified Contibank and all other nominee banks[9] of the cancellation of its earlier authorization that the proceeds of export sales be held at the disposal of the Syndicate instead of Schroder. The letter of cancellation also directed the nominee banks to hold all funds then in, and those which might thereafter come into, their possession subject to Schroder's orders and to report to Schroder the amount of potash proceeds then on hand.

Contibank did not comply with the request but on September 11th asked Schroder to send a representative to discuss the loan service question. On September 19 and 20, 1939, R. J. Clutton of Schroder, who was familiar with the loan transaction, conferred at Amsterdam with Diehn, the Syndicate's managing director, and Frohnknecht of Contibank. Also present, but only for part of the conference, was A. W. A. Meijer of Hope & Co.

The discussion centered principally about the loan service requirements. Diehn was concerned with maintaining the loan service despite the War, particularly in the light of a provision in the trust deed which obligated the Syndicate "to pay regularly the coupons and drawn Bonds whether in time of Peace or War and whether the holders be subjects of a friendly or hostile country". Diehn suggested that the Syndicate's undertaking could be fulfilled if the British Government would permit the Syndicate to export potash through the blockade to countries outside of Europe so as to obtain funds for the loan service. The pro-

---

7. Under these agreements a governmental agency in one country collected all moneys due the other country; it was a set-off arrangement.

8. The United States and Japan were not parties to the restrictive clearing agreements and hence payments due for potash exported to them were unaffected by the agreements.

9. Except those in Germany.

posal was in due course submitted by Schroder to the British Government, which took the matter under advisement.

Pending a decision, Contibank on October 3, 1939 remitted to Schroder £108,-148, the loan service requirement for the month of October, 1939. This was the last loan service money received, directly, during the war period by Schroder as receiving bank from Contibank. Even without this last remittance, Schroder had on hand as of the outbreak of war sufficient funds to meet the full semi-annual service requirement due November 1, 1939 of £522,168 for the Series A and B bonds, two-thirds of the six months' service, due January 1, 1940 for Series C bonds and the amount required for the redemption of the Series C bonds on January 1, 1940, the drawing for which was to take place in October, 1939.

Accordingly, Schroder applied for and obtained permission from the British authorities to utilize such funds to the extent required for the loan service due on November 1, 1939 on the Series A and B bonds and for the redemption of the Series C bonds on January 1, 1940; however the permission was limited to payment only to those bondholders presenting non-enemy of England declarations.

Hope & Co. (hereafter called "Hope"), an investment banking concern of Amsterdam, Holland, now enters the scene in a more active role. It had been one of the original underwriters of the loan and from its inception had acted as one of the paying agents on the continent.[10]

When Schroder received authorization from the British officials for the payment of the loan service due on November 1st, it notified Hope, as one of the Conti-

nental paying agents, of this fact and also that the authorization was subject to non-enemy of England declarations. There had been some indication by the Amsterdam Stock Exchange that any requirement by Hope and other continental paying agents that bondholders present such non-enemy declarations would cause the Exchange to mark on its official list that the loan was in default. The Syndicate sought to avoid this situation, as it also sought to avoid an actual default. On October 31, 1939 Contibank, upon Syndicate's instructions, notified Schroder that it planned to remit to Hope guilders equivalent to £108,148 representing the next month's monthly loan service which would provide Hope and other sub-paying agents with sufficient funds to pay November 1st coupons to continental bondholders without requiring non-enemy of England declarations. Schroder asked that this be deferred pending Clutton's arrival at Amsterdam on November 1st. However, by the time he arrived there Contibank had already paid to Hope the monthly advance funds in guilders for November, 1939 and it and other continental paying agents had commenced payment of the coupons out of such advance funds. The payments were made without requiring a non-enemy declaration whereas Schroder paid English and Allied bondholders only upon presentation of a declaration.

At the November conference Clutton was informed that future advance monthly payments would be made only to Hope. Clutton offered no objection. Indeed he pointed out that guilders equivalent to £108,148 per month (the sum already paid to Hope for November) were insufficient and suggested an increase to £110,-000.[11] Thereafter Contibank made

---

10. Hope in Amsterdam, J. Henry Schroder Banking Corporation in New York, and Credit Suisse in Zurich, acted as sub-paying agents. In practice Schroder, as principal paying agent, either remitted a lump sum of money to each sub-paying agent from which it paid coupons and drawn bonds presented, later accounting to Schroder, or Schroder permitted the sub-paying agent to draw upon it from

day to day to cover payments advanced. After November 1, 1939 Hope reimbursed the other paying agents (other than Schroder and J. Henry Schroder Banking Corporation in New York) from the funds it had received from Contibank commencing November 1, 1939.

11. The additional amount is accounted for by estimated exchange differences.

monthly advance payments in guilders equivalent to £110,000 each covering the loan service for the succeeding months to March, 1940 inclusive.[12]

To the extent that funds were paid out on the continent by Hope for the November 1, 1939 and January 1, 1940 service payments, the equivalent amount was transferred by Schroder out of the Dividend and Redemption Accounts to the Special Deposit Account and released for future loan requirements.[13]

In January, 1940 the British authorities rejected the Syndicate's proposal for permission to export potash through the blockade and the Syndicate was so notified. Thereafter in late February, 1940 Clutton had a final conference at St. Moritz, Switzerland with Diehn, Frohnknecht and Krayenhoff, the latter the auditor of accounts of Contibank. The discussion centered about the loan service. Clutton was informed by Diehn that in view of the existing state of war between England and Germany, Schroder could not expect future service payments through either the Syndicate or Contibank. He was also advised that after May 1, 1940 Contibank would continue to put Hope in possession of funds to pay coupons but not the full amount of the loan service since Series A and B bonds had been redeemed at a more rapid rate than called for by the terms of the loan.[14] It was generally understood that Hope would continue to pay neutral and German bondholders whereas Schroder, to the extent that it had available funds on hand, would continue to pay English and Allied bondholders. Clutton advised Diehn and the others present of the approximate balance which Schroder had

on hand for such purposes, which in fact then amounted to £386,154.

The February, 1940 conference was the last one held among the interested parties during the war period. The first loan service date following this conference was May 1, 1940—for the Series A and B bonds. Section 15(a) of the principal trust deed required that the Syndicate procure the receiving bank to pay to the English bankers (Schroder) as paying and sinking fund agents, the May 1st loan service at least twenty-eight days before—in this instance April 3, 1940— and if not paid seven days before the May 1st due date then the principal of all bonds shall immediately become payable.

### The Issue of Default

Plaintiff, under its first cause of action, contends that the semi-annual payments for the service of the Series A and B bonds as required by the trust deeds were not made seven days before May 1, 1940; that this constituted a default in consequence of which the principal of all the bonds, including Series C, became immediately due and payable; that the principal and interest due by reason thereof is in excess of the vested property. The defendant denies that any default occurred. Thus April 24, 1940, according to the plaintiff's theory, is a crucial date.

On April 24, 1940 Schroder had on hand as receiving bank or paying agent £386,154. The amount required for the May 1, 1940 loan service for the A and B bonds was £522,168. Since the full amount was not in Schroder's hands on April 24th, seven days before the serv-

---

12. Under the 1931 arrangement for advance payments the half-yearly May loan service requirements were completed with the payment made for the month of March.

13. For example, Schroder due to the limitation imposed by the English authorities to pay only upon presentation of non-enemy declaration, paid out only 55% of the amount authorized to meet the November 1, 1939 distribution and Hope (out of funds received by it from

Contibank) paid the balance on the continent. Instead of reimbursing Hope and other paying agents as had been the practice prior to November, 1939 (see footnote 10), the balance was released by Schroder for future loan requirements.

14. The Syndicate or Hope had made substantial purchases of the bonds in the then depressed market and had cancelled them in part satisfaction of the then current sinking fund requirements.

ice date, the plaintiff claims an automatic default occurred under § 15(a) and other provisions of the trust deed. Plaintiff argues that the funds with Hope cannot be treated as part of the loan service funds since the trust deed requires that the funds be in the hands of the English bankers (Schroder). As we have seen, Contibank made five advance monthly payments to Hope for November, 1939 to March, 1940. It is acknowledged that if all of these payments had been made directly to Schroder (as was the October, 1939 payment), then Schroder would have had on hand sufficient funds to satisfy the May 1, 1940 loan service requirement for the Series A and B bonds.

Thus, apart from other questions arising under § 15(a) of the trust deed, an immediate factual question exists as to whether the necessary amount to meet the May 1, 1940 loan service was in the bankers' hands seven days prior thereto. The events must be considered against the background of the disrupted conditions which followed the outbreak of hostilities between England and Germany. The Syndicate sought to avoid a default. Pending action by the British Government upon Syndicate's proposal, eventually rejected, that it be permitted to export potash through the blockade, the October, 1939 monthly advance payment was made to Schroder and then followed the five subsequent advance monthly payments to March, 1940 to Hope under circumstances already related. Although the first of these advance payments to Hope was made before Clutton's arrival at the Amsterdam conference, the last four were made following the conference which, in addition to Clutton as Schroder's representative, was attended by representatives of the Syndicate, Contibank and Hope.

I am persuaded that the evidence warrants a finding that at this meeting Clutton was advised and understood that the payments to Hope were intended as monthly loan service payments; that Hope, with the consent of Schroder and the other interested parties, was to act as "substitute" receiving bank and "temporary banker"; that in view of unsettled conditions Hope was to service the loan on the continent while Schroder would service British, Allied and American bondholders. Apart from what transpired at the conference in November, 1939, the relationship of the parties to the loan, as well as subsequent events, admissions and actions of the parties, fully support this finding.

First, Hope was no stranger to the loan transaction. It was, together with Schroder, one of the underwriters of the loan. Its relationship to the transaction did not end there. While Schroder and Higginson & Co.[15] were named as English Bankers, the trust deed specifically defines the "Bankers" to mean the "English Bankers and Hope & Co. * * *."[16]

The Syndicate as obligor under the loan of course had an interest in avoiding a default. Schroder, Hope and other underwriters as sponsors of the £15,000,000 loan, while not liable for its payment, also had an interest to assure continued loan payments. Thus the obligor, the bankers, and the receiving bank simply adopted a modus operandi to keep the loan current despite turbulent war conditions, and this was subsequently ratified by the trustee.

The actions of the parties following the November, 1939 conference bear strong witness that Hope by mutual consent was not only to receive thereafter the monthly service payment but was to act as "temporary banker". That the arrangement had the consent not only of Schroder but was fully recognized and acquiesced in by the plaintiff, Royal Exchange Assurance, cannot be seriously disputed on this record.

As Hope received, after the conference, each month's advance remittance from Contibank, it notified Schroder. It also kept Schroder informed as to pay-

---

15. Higginson & Co. appears not to have acted in its defined capacity at any time.

16. Page 6 of the Trust Deed.

ments of interest to bondholders and redemption of bonds.

Neither Schroder nor Royal Exchange Assurance, which was kept advised of the situation and developments by Schroder, at any time protested the payments made by Contibank to Hope—not even when the British authorities rejected the Diehn proposal in January, 1940 did either indicate that the continued payment of the monthly advance to Hope was not agreeable.

Schroder on April 3, 1940 reported to plaintiff-trustee the facts relating to the loan since the outbreak of the War, particularly as to Hope's activities and the advance monthly payments made to it. In that report to the plaintiff, Schroder, noting the Syndicate's proposal made at the September, 1939 conference for British consent to export potash through the blockade, stated that pending its consideration " * * * monthly remittances continued on approximately the usual scale, as shown below * * * ", and listed separately the October payment to Schroder and the five advance payments to Hope with the significant comment that Hope was "unofficially nominated as temporary bankers to the loan".

When the form of the English non-enemy declaration appeared to exclude payment to American bondholders, Schroder in April, 1940 wrote to Hope "you will see that this will exclude American holders of bonds so that these will also have to look to you for payment in the future."

When in 1945 Royal Exchange Assurance, as trustee, filed an application with the Alien Property Custodian to withdraw $1,369,941 on deposit with J. P. Morgan & Co. representing a portion of the advance monthly payments to Hope,[17] it stated: "Following the outbreak of

war between Germany and England in September, 1939, Messrs. J. Henry Schroder & Company of London, the English bankers and the receiving bank and principal paying agent under the loan, made an informal arrangement with Hope with the sanction of the governmental authorities whereby Hope exercised certain of the functions of Schroder pursuant to Article Sixth of the principal trust deed [18] and corresponding sections of the supplementary trust deeds referred to above."

Significant too is an exchange of correspondence in 1945, upon the termination of hostilities, among Hope, Contibank and Schroder. Hope in a letter report to Schroder at that time referred to itself (Hope) as "substitute receiving bank on the continent during the war as agreed with you in 1940". Contibank also wrote to Schroder touching upon substantially the same matters. Schroder in reply wrote "We assume that the arrangements made between us in the latter part of 1939 and early 1940 were continued in the same form after the invasion of your country."

Finally, the plaintiff-trustee never declared a default; the fact is that the May 1, 1940 distribution was made by Schroder and Hope by the application of funds then in their hands with the knowledge and acquiescence of the plaintiff-trustee.

The force of events at and following the November, 1939 conference is such that although plaintiff denies Schroder ever agreed that Hope should become "a substitute receiving bank" or "temporary bankers", nonetheless it is constrained to admit that "at most Schroder went along with plans made by the Syndicate, Contibank and Hope which it could not prevent and which seemed at the time advantageous to the bondholders".[19]

---

17. Hope had converted a number of the advance monthly payments of guilders to dollars and maintained the dollar deposits in its own name with J. P. Morgan & Co. in New York.

18. Which provides for payment of the loan service by the receiving bank to the

English bankers as paying and sinking fund agents. (See p. 7, supra.)

19. Plaintiff's Reply Brief, p. 29 n. It seeks, however, to avert the effect of this admission by a contention that Schroder had no power to bind bondholders to any deviation from the provisions of the trust

Schroder as receiving bank clearly had the right to designate, with the Syndicate's approval, Hope as a nominee bank to receive the full monthly allocations. Under § 14 of the trust deed the Syndicate covenanted to give the necessary authority and direction to insure that all potash proceeds should "be received by the Receiving Bank *or* by its nominees approved by [Syndicate]". Also Schroder had the power to designate another bank to assist it in performing its specified functions.

Upon all the evidence a finding is compelled that not only did the arrangement for Hope to function as "substitute receiving bank" and "temporary banker" have the consent of Schroder both in its capacity as receiving bank and banker, but that this arrangement was acquiesced in and ratified by the plaintiff.[20]

■ Under the circumstances the remittances made to Hope must be given effect as payments under the trust deed, and so considered, there was no default with respect to the loan service requirement for May 1, 1940 which was due no later than April 24, 1940.

■ Apart from the foregoing, other factors preclude plaintiff's claim that a default occurred with respect to the May 1st payment. Section 15(a) of the principal trust deed provides that if twenty-eight days before the distribution date of loan service payments (May 1st and November 1st) the funds in the hands of the receiving bank shall be insufficient to make the required payment to the English Bankers then the Syndicate shall pay the deficiency "within three days of notification by the Receiving Bank". It is conceded that no notice of such deficiency was given at any time after April 3, 1940 (twenty-eight days before May 1st). However, the plaintiff contends that at the February, 1940 conference

Clutton informed those present, including Diehn, that Schroder had approximately £386,000 on hand and since this was clearly insufficient the Syndicate had notice. But this fact was adverted to in a discussion the purpose of which was to find a way of avoiding a default. Obviously this was not the notice required or contemplated under § 15(a).

Plaintiff, however, advances an alternative position and contends that notice to the Syndicate of any deficiency of funds in the hands of the receiving bank was not required and that an automatic default followed since the Section also provides that the principal of the bonds shall immediately become due and payable if the loan service requirements are not paid seven days before the distribution date (May 1st).

I am persuaded this position cannot be upheld. To adopt that construction would render meaningless and as complete surplusage the clause in § 15(a) that if the "funds in the hands of the Receiving Bank shall be insufficient to make such payment the Company shall within three days *of notification* by the Receiving Bank pay such deficiency to the Receiving Bank". (Emphasis supplied.)

The notification required as a condition of default is readily understandable in view of the far-flung nature of the receiving bank system. In the event of non-payment of the service requirement seven days before the first of May or November, referred to in § 15(a), the principal of the bonds would automatically become due only if prior thereto the Syndicate had been given the required notice of any insufficiency of the funds in the hands of the receiving bank, thereby affording the Syndicate the opportunity to pay the deficiency and thus avoid a default. Since the notification

deed. But there is no claim by the defendant that Schroder had the power, or undertook, to act for the bondholders. Schroder did, however, have the power to appoint agents or representatives to aid it in performing its specified functions.

20. It is noted that § 14 of the trust deed required the Syndicate to appoint such receiving bank as the Bankers "from time to time" required.

provision was not complied with, no automatic default occurred.

The plaintiff urges in addition that, default or no default, it has the requisite interest, right and title to the vested funds.

### The Source of the Vested Funds

On September 4, 1939 when Schroder notified Contibank of the revocation of the 1926 authorization to it to hold the proceeds of export potash sales subject to the Syndicate's direction, more than $16,000,000 were credited to various accounts in the Syndicate's name in Contibank, including the secret Special Receiving Account. The credits represented dollar proceeds of export sales which had been received by New York and Boston banks from Potexma, the Syndicate's sales company in the United States, and Nippon, its Japanese sales company. The dollar proceeds were credited to Contibank's accounts with these banks. Contibank in turn upon receipt of advice of the deposits had credited the Special Receiving Account accordingly. The actual dollars remained on deposit with the American banks.

The September 4th revocation letter was one of the matters discussed at the September 19–20 conference at Amsterdam. Contibank, acting upon an opinion of a Dutch lawyer, took the position and so advised Clutton, that it (Contibank) was under no obligation to account or pay over to Schroder the funds then in its hands or which it might thereafter receive as long as all monthly payments were current and that under such circumstances the funds were subject to Syndicate's disposal. Clutton was not informed as to the balance then in the Syndicate's favor.

It was shortly before, on September 14, 1939, that upon instructions of the Syndicate the dollar balance, then approximately $16,000,000, in the secret Special Receiving Account on Contibank's books, had been transferred to Securitas. The purpose of the secret account was to avoid possible attachment by foreign creditors who, because of the War, might no longer feel bound by the German debt moratorium agreements.

On September 30, 1939 the balance in the disclosed Receiving Bank Account on Contibank's books was transferred to the disclosed Deposit Account. Thereafter upon Syndicate's orders dollar proceeds of potash were transferred from the undisclosed Special Account on Securitas' books to the disclosed Deposit Account on Contibank's books. The funds were thereupon disbursed from the Deposit Account not only for loan purposes such as the payments made to Hope but for other Syndicate obligations unrelated thereto.

Of the $16,000,000 credit balance in September, 1939, including the balance transferred to Securitas, as well as those which remained on Contibank's books, approximately $10,000,000, upon Syndicate's instructions, were disbursed up to May 10, 1940, leaving a net balance of $6,184,640. This balance in favor of the Syndicate was on deposit in the United States to the credit of Contibank or Securitas in the form of approximately $5,000,000 cash and a note investment of $1,000,000.

On May 10, 1940 all Netherlands bank accounts in the United States were frozen, including the accounts and note just referred to.[21] They remained frozen until they were vested by the defendant as the property of the Syndicate and are the subject of the present suit. It is with respect to these vested funds that the plaintiff urges that it had an "interest, right, or title" under § 9(a) of the Trading with the Enemy Act. The Act permits any person not an enemy or an ally of an enemy to sue for the recovery of vested property in which he can establish "any interest, right, or title". Under the Act, if plaintiff's interest is not of a proprietary nature but merely that of a general creditor, its action must fail.[22] It is therefore necessary to de-

21. Executive Order 8389, as amended, 12 U.S.C.A. § 95a.

22. § 34 of the Act; Cabell v. Clark, 2 Cir., 162 F.2d 153; Alley v. Clark, D.

termine what "interest, right, or title", if any, plaintiff had in the vested funds.

Plaintiff's contentions, no matter how phrased, that it had an "interest, right or title" to the vested funds center about § 14 of the principal trust deed which contains the provision for the receiving bank and its operation. Plaintiff argues that its interest, right or title derives from an express trust under the trust deed; and further from a constructive trust for its benefit; that it has an equitable lien on the funds, and that the defendant is estopped from denying its asserted right, title and interest to the vested funds.

Since § 14 is of crucial importance with respect to the various contentions advanced by the plaintiff trustee, it is desirable to repeat it verbatim.

Section 14: "The Company shall at all times during the currency of the Loan appoint such person firm or corporation (hereinafter called 'the Receiving Bank') as the Bankers shall from time to time require for the purpose of supervising the disposal of the proceeds of the sale of all potash exported either directly or indirectly to countries outside the German Reich at any time whilst the Bonds or any of them shall be outstanding and all the costs charges and expenses of the Receiving Bank in connection therewith shall be paid by the Company. The Company with the approval of the Bankers hereby appoints J. Henry Schroder & Co. of London England to be the Receiving Bank. The Company undertakes that during the currency of the Loan it will give all such authorities and directions and do all such acts and things as shall be necessary to ensure that all proceeds of the sale of potash so exported shall be received by the Receiving Bank or by its nominees approved by the Company. *All such proceeds so received shall be held by the Receiving Bank or by its nominees upon trust firstly to set aside in every calendar month a sum sufficient at the time of each such setting aside to provide one-twelfth of the amount required for the annual service of the Bonds* and to pay the same in accordance with the provisions of Article Sixth hereof (for which purposes the proceeds of the sale of potash exported to the United States of America and Great Britain shall be utilised in the first place) and *secondly to hold the remainder* (after making up any sum by which such proceeds in previous months have been insufficient to provide such one-twelfths and after retaining all sums payable under § 15 clause (c) hereof and deducting all costs charges and expenses then due and payable to the Trustees and the Bankers hereunder) *at the disposal of the Company."* (Emphasis supplied.)

The parties are in accord that the trust deeds define the respective rights of bondholders and the Syndicate. They also agree that these and other relevant documents are to be construed in accordance with English law.[23]

Each party offered the testimony of English barristers as to the construction and meaning of the trust deeds and—as is not unusual in the instance of expert testimony—their opinions were in sharp conflict. While they agree that the trust deeds, particularly § 14 of the principal trust deed, are by their express terms clear and unambiguous, each reached a different and conflicting conclusion as to their meaning. The Court agrees with the experts on the only subject as to which they appear in accord—that § 14 is clear and unambiguous. The Court is not bound by either of the conclusions or interpretations expressed by the experts; it may take judicial notice of English law and determine the meaning and effect of the trust deeds under applicable English rules of

C., 71 F.Supp. 521; Blank v. Clark, D.C., 79 F.Supp. 373.

23. The principal trust deed provides they are to be so construed and since England is the place of contracting and performance the purpose of the parties will be given effect. Shannon v. Irving Trust Co., 275 N.Y. 95, 102, 9 N.E.2d 792; Wilson v. Lewiston Mill Co., 150 N.Y. 314, 323, 44 N.E. 959.

construction.[24] Since we are dealing with admittedly clear and unambiguous language, then under such rules of construction the terms used in the trust deeds are to be taken in their plain and ordinary sense.[25]

The plaintiff's basic contention is that § 14 created a valid single express trust of all potash proceeds received by the receiving bank or nominee banks; that the receiving bank was to hold and apply the proceeds for two purposes: *firstly*, to set aside in every calendar month one-twelfth of the annual loan service; and *secondly*, (after making certain other allocations) to hold the remainder at the disposal of the Syndicate. Under this concept the receiving bank is the trustee; the Syndicate is the settlor; the beneficiaries of the first part of the trust are the bondholders; and the beneficiary of the second part is the Syndicate as possible remainderman.

Plaintiff's argument proceeds that when the monthly service allocations have been met, the sums so set aside were held in trust (1) for the bondholders, and (2) the remainder, if any, for the benefit of the Syndicate subject to its disposal. Thus it concedes that as long as the monthly allocations have been met the Syndicate would be free to withdraw or otherwise dispose of the remainder funds. But, and this is the crux of its position which poses the basic question, it contends that if any remainder proceeds are not withdrawn or disposed of by the Syndicate before the first of the

next succeeding month, then they again become subject to the first part of the trust—that is, for the benefit of the bondholders. In sum, that although up to the end of a month all remainder funds were held in trust for the benefit of, and subject to disposal by, the Syndicate, once it failed to exercise its power of disposal, and notwithstanding that all prior monthly commitments had been met, then the surplus funds reverted to the trust or were subject to a continuing charge for the benefit of the bondholders.[26]

In support of its position plaintiff refers to the receiving bank arrangement as a security device and to a statement contained in the bonds to the effect that the trust deed provides the loan will be secured, inter alia, by a "first charge on the proceeds of sale of Potash to countries outside Germany the whole of which will be receivable by Schroders or some other Receiving Bank * * *". Plaintiff also points to the overall and primary purpose of the trust deed to guaranty full payment of the loan.

Undoubtedly the receiving bank provision was intended to assure payment of the bonds, but that offers no answer to the precise question here presented as to plaintiff's right, title and interest in the specific funds in question. While § 14 clearly created a first charge and trust of the potash proceeds in favor of the bondholders to the extent required to meet the monthly service requirements, it seems with equal clarity

24. See Walton v. Arabian American Oil Co., 2 Cir., 233 F.2d 541; Siegelman v. Cunard White Star, 2 Cir., 221 F.2d 189, 196–197.

25. See 11 Halsbury's Laws of England, §§ 632, 633 (3rd Ed. 1955). The experts also agreed that the correct rules of construction are set forth in Halsbury.

26. This contention appears quite contrary to Schroder's view when it wrote to the trustee " * * * it has been the practice of the German potash Syndicate for some time to pay us before the beginning of every month a sum equal to the sum which we should deduct from the proceeds during the following month. We

are advised that so long as the German potash Syndicate continues this practice we are not entitled to make any deduction from the proceeds passing through our bank or our nominees', in as much as the funds which Article Fifth requires us to provide by such deduction are in our hands each month before the obligation to make such deduction arises. So long as this practice continues, therefore, proceeds passing through us or our nominees are at all times held at the disposal of the company in accordance with the ultimate trust declared by Article Fifth." Plaintiff-trustee took no exception to this position. (Plaintiff's Exhibits 31, 32)

to have provided, as plaintiff concedes, that once the monthly requirements were met the remainder or surplus was at the disposal of the Syndicate. I find no words or language therein to suggest that the Syndicate's right was dependent upon actual disposition or withdrawal of the funds before a new month commenced and that absent such action plaintiff as bondholders' representative acquired any interest, right or title to the funds.

So, too, in the instance of the bonds. While they refer to a "first charge" upon the potash proceeds, nowhere therein is there any language to suggest a continuing charge in favor of the bondholders on the remainder proceeds unless withdrawn by the Syndicate. The construction contended for by the plaintiff-trustee would require the addition to the clause "hold the remainder * * * at the disposal of the [Syndicate]" of words or language substantially to the effect: "unless withdrawn prior to the first day of the next month, failing which such remainder shall revert to the first trust for annual service requirements". This would require rewriting the agreement of the parties. Indeed, it would violate the English rules of construction against implying terms in the agreement which are not necessary to give business effect to it.[27]

In terms of practical business operation the sought-for construction would have been quite unrealistic. With all export proceeds being received either by the receiving bank or nominee banks, far-flung as they were in different countries of the world, a determination of the remainder available on the last day of a month, following the monthly allocation, would not have been feasible—and under plaintiff's interpretation it would necessarily follow that in the absence of the necessary information to enable the Syndicate to withdraw the remainder, it automatically reverted the following day to the first part of the trust. This hardly could have been within the contempla-

tion of the parties. The loans were in a very substantial amount—almost $75,-000,000. The underlying documents and trust deed give every sign of professional draftsmanship and of deliberate, not casual, preparation. If specific additional security interests in favor of the bondholders, vital to any loan agreement, had been intended certainly they would have been clearly expressed. While the excess funds are, under the trust deed, declared to be held at the disposal of the Syndicate, no mention is made of bondholders' rights if not withdrawn.

The fact that § 14 provides that all proceeds received by the receiving bank or the nominee banks are held "in trust" does not aid the plaintiff's position since the words "in trust" must be considered with reference to the designated beneficiaries—the bondholders and the Syndicate—and as to the latter when it is expressly provided that the remainder proceeds are to be held at the disposal of the Syndicate, it is the Syndicate that is the beneficiary and not the plaintiff as the bondholders' representative. Moreover, the trust characterization also bears on the rights of the Syndicate as well as the bondholders as against the receiving bank—protection of the funds as against the receiving bank and its creditors.

Nor is the plaintiff's position bolstered by § 48 of the trust deed upon which it places great store. Section 48 provides for the application by the trustees toward the outstanding principal and interest of the proceeds of sale of the mortgaged properties together with "any other sums which may be held or received by the Trustees or by the Receiving Bank or by the Bankers or the Agents of any of them * * * under any of the provisions of this Indenture *as part of the trust estate for the full benefit of the holders of the Bonds* * * *" (emphasis supplied).

Plaintiff claims the reference to the "trust estate" demonstrates a clear purpose that all unwithdrawn remainder

---

27. 11 Halsbury's Laws of England, § 629, et seq.

funds are deemed trust funds for the benefit of the bondholders. But this section relates to remedies of the trustee and bondholders only after a default and creates no rights where none existed previously. The right to apply proceeds in the hands of the receiving bank or nominee banks comes into being only in the event of default. Since I have found that no default occurred, § 48 is inoperative with respect to funds in the receiving bank or in nominee banks—that is, assuming arguendo that plaintiff's construction of the Section is correct.

I am persuaded that a fair reading of § 14, and giving the words "hold the remainder * * * at the disposal of the Company" their ordinary and natural meaning, compels the rejection of plaintiff's construction that it had a security or trust interest in the remainder funds if not withdrawn by the Syndicate, which constituted an "interest, right, or title" within the meaning of § 9(a) of the Trading with the Enemy Act.

But separate and apart from the fact that no default occurred prior to the vesting of the funds, I am of the view that even were the plaintiff's construction of § 14 to be adopted, the facts of the case fail to sustain its claim. Its essential hypothesis, of course, is that the failure of the Syndicate to dispose of the remainder funds subjected them to a continuing charge in favor of the bondholders and gave it (as trustee for the bondholders) the requisite interest, right or title therein. Accordingly, if in fact there were a disposal of remainder funds by the Syndicate, the entire structure of plaintiff's case collapses. I am satisfied the evidence establishes that the Syndicate did exercise its power of disposal and effectively withdrew, prior to any default, the funds from the receiving bank or nominee bank—in this instance Contibank.

The vested funds had their origin principally in the $16,000,000 credit balance which had been transferred upon Syndicate's instructions to Securitas on September 14, 1939 when the secret Special Account was opened.[28] The balance so transferred represented a surplus or remainder over and above monthly loan requirements which had been accumulated through the years going back to 1934. At the time of the transfer all monthly loan service allocations had been fully met. Under the circumstances the direction of the Syndicate was a disposition of funds by it.

That the transfer was made to Securitas, a wholly owned subsidiary of Contibank, does not detract from the fact that the Syndicate exercised its right to dispose of remainder funds. Securitas was an entirely independent entity from Contibank. It was not a nominee bank. Syndicate in exercising its power of disposition of remainder funds had a right to designate whatever depository it desired to receive them. The transfer of the $16,000,000 credit from Contibank to Securitas upon Syndicate's orders was just as effective a disposition as if it had been ordered transferred to a completely unaffiliated bank. Indeed, any intra-account transfer of remainder funds (on Syndicate's instruction) on the books of Contibank, a general banker for the Syndicate, from a receiving bank account to any general Syndicate account, would have been just as effective a disposal of the funds as a transfer to an unaffiliated bank.

Neither does the Syndicate's motivation in transferring the funds to a secret account detract from the effectiveness of its disposition when there was no default. That the transfer was made to a concealed account has no greater bearing on the plaintiff's right under the trust deeds than if Syndicate had in fact withdrawn the funds and redeposited them in a new account either with Contibank or any other bank in an unrecorded or disguised account, or itself had cached the funds.

That the $16,000,000 transfer and the opening on September 14, 1939 of a new

28. The Special Receiving Account on Contibank's books was closed. Also transferred to Securitas was a credit balance in the Loan Foreign Exchange Account which was also closed.

account on Securitas' books was a disposition and exercise of dominion over the funds by the Syndicate is evidenced by the fact that the Account was thereafter freely drawn upon for purposes entirely unrelated to the loan. Thus to cite but a few examples: In November, 1939 $1,-500,000 were transferred out of the Securitas Special Account to the Deposit Account still maintained with Contibank in Syndicate's name and then paid by the Syndicate to the Reischsbank for remittance to the Bank of International Settlement; also funds were transferred to a guarantee account to cover advances which Contibank had extended to the Syndicate against potash exports; and in one instance $5,000,000 were transferred to a Syndicate account in a Swiss bank.

The various disbursements and intra-account transfers from September, 1939 to May 10, 1940 left a net balance of $6,-184,640 at the time of vesting which appeared as a dollar credit balance in favor of the Syndicate on the books of Securitas and Contibank—the actual dollar proceeds being on deposit with American banks either in cash or in the form of investment in a note of $1,000,000.[29]

That the actual dollars were carried in part under Contibank's name in banks in the United States did not deprive the Syndicate of its power of disposal at a time when there was no default. When the Syndicate exercised its power of disposition over remainder funds as it did on September 14, 1939 and ordered the opening of a new account with Securitas, it became entitled to the proceeds from Contibank and to draw upon them, and it mattered not where or under what name or account Contibank held the actual dollars.

On all the facts the contingency of non-withdrawal of remainder funds upon which plaintiff's claims are posited did not occur.

The conclusion I have reached disposes of the subsidiary grounds relied upon by the plaintiff which include a claim of constructive trust and equitable lien. To uphold its theory of a constructive trust, advanced under its second cause of action, plaintiff relies upon the failure of Contibank as a nominee bank to report and account for the funds which it had in its hands to the credit of Syndicate when Schröder on September 4, 1939 notified Contibank of the cancellation of prior arrangements by which potash proceeds were to be held at the disposal of the Syndicate.

However, this does not aid the plaintiff's position since at that time and on the date of withdrawal of the funds, September 14, 1939, loan service requirements had been fully met. Under this circumstance, the $16,000,000 which Contibank held in the Special Receiving Account constituted remainder funds which under § 14 were at the disposal of the Syndicate, and its direction to transfer the credit balance could not be denied. Contibank, as a nominee bank, had no greater right than Schroder as principal receiving bank to reject the Syndicate's disposition of the remander funds, in particular to refuse its instruction to transfer the funds to Securitas. Section 14 is binding upon both Schroder and Contibank as a nominee bank. It imposes the same duty upon a nominee bank as upon the receiving bank, to hold remainder funds at the disposal of the Syndicate. Thus it specifically provides: "All such proceeds so received shall be held by the Receiving Bank or by its nominees upon trust firstly * * * and secondly to hold the remainder * * * at the disposal of the [Syndicate]".

Neither is there support for any claim of an equitable lien or charge against the funds in favor of the plaintiff. This, like the claim of constructive trust, is bottomed upon the alleged default, and since there was no default the contention must fail.

This disposition makes it unnecessary to pass upon the many and varied other contentions advanced by the litigants, although all have been fully considered.

---

29. The note was in the name of Securitas; the cash on deposit in the name of Contibank.

The motion made by the defendant to strike certain portions of the testimony of Max Pam, Chairman of the Board of Directors of Schroder, in respect to matters preceding the signing of the loan agreements and the trust deeds, is granted.[30]

The defendant is entitled to judgment upon the merits.

The foregoing shall constitute the Court's Findings of Fact and Conclusions of Law. Either party may propose additional findings of fact and conclusions of law within ten days upon three days' notice.

30. See 11 Halsbury's Laws of England, § 646 et seq.